S07G0126. THE STATE v. AIKEN.
(646 SE2d 222)

SEARS, Chief Justice.

We granted certiorari in this case to review the Court of Appeals's holding that a statement that the appellee, Robert Aiken, a probation officer, gave as part of a criminal investigation into his conduct could

not be used at trial against him.[1] More specifically, the case concerns the appropriate test by which to determine whether an incriminating statement made by a government employee during an investigation into his conduct is coerced and inadmissible based on allegations by the employee that he was impliedly threatened with the loss of his job if he did not answer questions during the investigation. The Court of Appeals adopted the test for admissibility of statements by public employees set forth in *United States v. Friedrick*,[2] rather than the test articulated in *United States v. Indorato*.[3] For the reasons that follow, however, we decline to adopt either test specifically, but conclude that trial courts should evaluate the totality of the circumstances surrounding the public employee's statement to determine whether it was voluntary. Moreover, in the present case, under a de novo review of the undisputed facts, we conclude that Aiken's statement was coerced. Accordingly, we affirm the judgment of the Court of Appeals excluding the statement from use by the State.

1. The *Friedrick* and *Indorato* cases are progeny of the Supreme Court's decision in *Garrity v. New Jersey*.[4] In *Garrity*, several police officers were the target of an investigation concerning the fixing of traffic tickets. Before being questioned by investigators, each appellant was warned "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office."[5] These warnings were apparently based on a New Jersey forfeiture-of-office statute that provided that, if an employee refused to answer questions during an investigation, he could lose his job.[6] The officers answered the investigator's questions, and the answers were used against the officers in subsequent criminal prosecutions. Before the Supreme Court, the officers contended that their statements were coerced and involuntary "by reason of the fact that, if they refused to answer [the investigator's questions], they could lose their positions with the police department."[7] In resolving this issue, the Court relied, among other things, on cases that have examined the totality of the circumstances surrounding a defendant's statement to

---

[1] *State v. Aiken*, 281 Ga. App. 415 (636 SE2d 156) (2006).
[2] 842 F2d 382 (D.C. Cir. 1988).
[3] 628 F2d 711 (1st Cir. 1980).
[4] 385 U. S. 493 (87 SC 616, 17 LE2d 562) (1967).
[5] *Garrity*, 385 U. S. at 494.
[6] Id.
[7] Id. at 495.

determine whether a statement was coerced.[8] The Supreme Court concluded that the express threat of a job loss was sufficient to render the statement involuntary, holding "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic."[9] The Court did not base its ruling on the New Jersey forfeiture-of-office statute, and a review of the New Jersey Supreme Court's decision shows that the investigator who interviewed the officers did not refer to or quote from the statute.[10]

2. After *Garrity*, cases arose in which there was not, as in *Garrity*, an express threat of termination made to the employee, but in which the employee claimed, as does Aiken in the present case, that incriminating statements that he made during an official investigation were coerced because there was an implied threat that, if he did not cooperate in the investigation in question, he would lose his job.

To resolve whether an incriminating statement was coerced in cases involving implied threats of job loss, numerous courts, following the lead of *United States v. Friedrick*,[11] undertake a two-part analysis that examines whether the employee subjectively believed that he would be fired if he did not answer questions and whether that subjective belief was objectively reasonable.[12] In making the determination of objective reasonableness, the courts examine the totality of the circumstances surrounding the statements.[13] If the court finds that the employee's subjective belief was objectively reasonable, the employee's answers are considered to be coerced and may not be used against him in a criminal trial.

Other courts, however, relying on *United States v. Indorato*,[14] essentially have declined to extend the coerced testimony doctrine of

---

[8] See *Garrity*, 385 U. S. at 496 (citing, e.g., *Blackburn v. Alabama*, 361 U. S. 199 (80 SC 274, 4 LE2d 242) (1960)).

[9] Id. at 500.

[10] *State v. Naglee*, 207 A2d 689, 695 (N.J. 1965).

[11] 842 F2d 382.

[12] See *State v. Brockdorf*, 717 NW2d 657 (Wis. 2006); *United States v. Vangates*, 287 F3d 1315 (11th Cir. 2002); *People v. Sapp*, 934 P2d 1367, 1372 (Colo. 1997); *United States v. Camacho*, 739 FSupp. 1504, 1514-1515 (S.D. Fla. 1990); *State v. Connor*, 861 P2d 1212 (Idaho 1993); *State v. Lacaillade*, 630 A2d 328, 332 (N.J. Super. Ct. App. Div. 1993); *State v. Chavarria*, 33 P3d 922 (N.M. Ct. App. 2001).

[13] See, e.g., *Vangates*, 287 F3d at 1322-1323; *Brockdorf*, 717 NW2d at 668. For a subjective belief to be objectively reasonable, the State must have taken action that creates that belief; beliefs that may have been created by non-State actors are not relevant. Id.

[14] 628 F2d 711.

*Garrity* to cases involving implied threats of job loss.[15] For example, in *Indorato*, the police officer who was under investigation contended that he was under an implied threat of dismissal if he refused to answer questions from his superior officers because the departmental rules, with which he was familiar, provided "for dismissal of any officer who refused to obey the lawful orders of superiors."[16] The court noted that there was nothing in the record to suggest that the rules had been interpreted to mean that an officer who refuses to provide self-incriminating statements would be terminated; that, in *Garrity*, the defendant had been explicitly told that his failure to answer questions would result in termination and there was a statute requiring the loss of a job if the defendant refused to cooperate; and that those factors were not present in *Indorato*.[17] The court also stated that it did "not think that the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within *Garrity*'s cloak of protection."[18]

Having examined the foregoing authority, we conclude that it is unnecessary to adopt the two-part test of *Friedrick* or the more narrow interpretation of *Garrity* espoused by other courts. Instead, because the Supreme Court in *Garrity* employed the totality-of-the-circumstances test for evaluating whether the defendant's statement was coerced, and because this State's courts have vast experience applying this test,[19] we hereby adopt that test for determining whether the statements that a public employee makes during an investigation into his activities are voluntary. Factors that a court may consider include those discussed in the foregoing cases, including whether the State actor made an overt threat to the defendant of the loss of his job if he did not speak with investigators or whether a statute, rule, or ordinance of which the defendant was aware provided that the defendant would lose his job for failing to answer questions.[20] If no express threat is present, the court may examine whether the defendant subjectively believed that he could lose his job for failing to cooperate and whether, if so, that belief was reasonable given the State action involved. In determining whether the defendant's belief was objectively reasonable, the court may examine

---

[15] See, e.g., *State v. Litvin*, 794 A2d 806, 808-809 (N.H. 2002); *People v. Coutu*, 599 NW2d 556, 561 (Mich. Ct. App. 1999); *People v. Bynum*, 512 NE2d 826, 827-828 (Ill. App. Ct. 1987); *Commonwealth v. Harvey*, 491 NE2d 607, 611 (Mass. 1986).

[16] 628 F2d at 715.

[17] Id. at 716.

[18] Id.

[19] See *Bell v. State*, 280 Ga. 562, 564 (629 SE2d 213) (2006); *Carswell v. State*, 279 Ga. 342, 344 (613 SE2d 636) (2005); *Flanders v. State*, 279 Ga. 35, 38 (609 SE2d 346) (2005).

[20] See *Brockdorf*, 717 NW2d at 668.

whether the defendant was aware of any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate. The court may also consider whether the investigator implicitly communicated any threat of dismissal either in written or oral form; whether, before the interrogation began, the defendant was told he was free to leave at any time; and whether the defendant was told he had the right to have a lawyer present.[21] A trial court, of course, is free to consider any other factor that it determines is relevant to the determination of voluntariness. We conclude that the totality of the circumstances test is in keeping with the spirit of *Garrity* and with the discretion our courts have historically enjoyed in determining whether a defendant's statement is voluntary.

3. Turning to the facts of the present case, at the hearing on the motion to suppress, Aiken introduced into evidence a document that he signed in October 2000 in which he acknowledged that he had read the Department's "Standard Operating Procedures"; agreed to be bound by them; and understood that he could be fired for failing to comply with those procedures. One of those procedures provided that he was required to "cooperate fully with any official investigation carried out by any law enforcement or administrative agency" and that, "[i]n cooperating with an official investigation," he would "respond truthfully to all questions asked." At the hearing, when asked if he had read the SOPs when he signed the acknowledgment, Aiken testified that "[t]ypically we had [the SOPs] attached to any memo or any document we sign when it was changed. So yes, I would imagine that I did read it before I signed the actual document." Aiken added that he was aware of "the procedures that required [him] to comply with investigations being conducted by the Department of Corrections," and that he was told by his supervisor and by his supervisor's boss to speak with the investigator in this case. Moreover, before the interview began, the investigator had Aiken sign a form that provided that,

> [i]f you interfere with an on-going investigation in any manner, you will be subject to disciplinary action, including dismissal from employment. Discussing this investigation, including matters covered in your interview . . . with anyone other than a member of the Investigative Staff or Legal

---

[21] In reviewing a trial court's determination regarding whether a statement is voluntary, we defer to the trial court's findings of fact unless clearly erroneous, but we review de novo the trial court's application of the law to undisputed facts. See *State v. Ray*, 272 Ga. 450 (531 SE2d 705) (2000).

Office of the Department of Corrections is one method of interfering with an on-going investigation.

Finally, based on the foregoing factors, Aiken testified that he thought that he could be fired if he did not answer the investigator's questions.

On cross-examination, Aiken testified that no one specifically told him that he would lose his job if he did not cooperate with the investigator, and that he could not swear that he had read the SOPs in October 2000. Aiken also acknowledged that he made a statement incriminating himself shortly after the investigator told him that she had enough evidence to prosecute him and that he had testified before a grand jury that the investigator had told him that he could be fired if he discussed any details involving her investigation. Aiken acknowledged, however, that, on the tape recording of the statement that was played at the hearing on the motion to suppress, he did not hear the investigator make that statement.

Here, no direct threat of termination from employment was directed at Aiken, and there is no statute or ordinance requiring dismissal for a failure to answer questions during an investigation. The record, however, supports a finding that Aiken had a subjective belief that he could be terminated if he did not answer the investigator's questions.[22] Moreover, considered in isolation, the fact that Aiken's supervisor and his supervisor's boss both told Aiken to meet with the investigator would not support a finding that it was objectively reasonable for Aiken to believe that he was coerced into answering the investigator's questions.[23] However, considering the directive from Aiken's superiors in combination with the form that the investigator had Aiken sign that provided that he could be fired if he interfered with the investigation "in any manner," we conclude that it was objectively reasonable for a person in Aiken's position to believe that he could be fired if he did not cooperate with the investigator.[24] Moreover, other factors that might lead to a finding of voluntariness are not present. For example, the investigator did not inform Aiken of his *Miranda* rights and did not inform Aiken that he was free to stop the interview at any time.

For the foregoing reasons, we conclude that Aiken was coerced in answering the investigator's questions, and that the Court of Appeals

---

[22] See *Vangates*, 287 F3d at 1322 (defendant's testimony that she believed that she could lose her job if she did not cooperate satisfies requirement of a subjective belief that her statements were compelled by threat of job loss).

[23] See id. at 1323.

[24] Based on Aiken's testimony on cross-examination that he was not certain he read the Department's Standard Operating Procedures when he signed his acknowledgment in October 2000, we do not rely on either of those documents in deciding this case.

correctly affirmed the trial court's ruling that the State could not use those statements at trial.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 4, 2007.

*W. Kendall Wynne, Jr., District Attorney*, for appellant.
*John L. Strauss*, for appellee.