**SECOND DIVISION**
**MILLER, P. J.,**
**REESE and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2019**

# In the Court of Appeals of Georgia

A19A0392. ZEIGLER v. THE STATE.

REESE, Judge.

Following a bench trial, Melannie Zeigler was convicted of possession of methamphetamine with intent to distribute, distribution of methamphetamine, conspiracy to violate the Georgia Controlled Substances Act, violation of the terms of her oath as a public officer, and crossing the guard lines with drugs.[1] Prior to trial, Zeigler filed a motion to suppress statements she made as a government employee that she contended were not free and voluntary, under the United States Supreme Court's decision in *Garrity v. New Jersey*.[2]

---

[1] See OCGA §§ 16-13-30 (b); 16-13-33; 16-10-1; 42-5-15 (a).

[2] 385 U. S. 493, 497-498 (87 SCt 616, 17 LE2d 562) (1967).

On appeal, Zeigler argues that the trial court erred in denying her motion. She also contends that the evidence is insufficient to support her conviction for violating her oath of office. Because the trial court erred in denying Zeigler's motion to suppress, we reverse her convictions and remand the case to the trial court with direction to grant Zeigler's motion.

Giving due deference to the trial court's findings of fact,[3] our review of the transcript of the *Jackson-Denno*[4] hearing and the audio recording of the interview reveals the following. In July 2016, Zeigler began working as a front desk operator, or "dispatcher," in the Habersham County jail. Zeigler, who was not a P.O.S.T.-certified law enforcement officer,[5] testified at the hearing that this was her first law-enforcement-related job, that she had previously worked for a drycleaner and a blood bank, and that she had received no training when she started working at the jail. Zeigler testified that she had never arrested anyone, that she did not have the

---

[3] See *State v. Aiken*, 282 Ga. 132, 136 (2), n. 21 (646 SE2d 222) (2007).

[4] See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[5] Georgia Bureau of Investigations Special Agent Clay Bridges testified that he was P.O.S.T.-certified, which meant "[t]he State certifies police officers by requiring a certain number of hours to become certified and to maintain that certification every year by having a minimum standard of 24 hours."

2

authority to arrest anyone, that she had never been trained on how to conduct an investigation or interview, and that she had never conducted an investigation or interview.

Zeigler testified that she had taken "male[ inmate]s from upstairs [in the jail] to the room where they do the investigations, and it is the patrol room, slash, investigations [room]." With respect to the hierarchy within the Habersham County Sheriff's Office ("Sheriff's Office"), Zeigler testified that she was "on the very bottom[ ]" among the staff and that she took orders from other employees.

Zeigler testified that she had read and understood the internal policies of the Sheriff's Office. A copy of those policies is not part of the record on appeal. We thus accept the trial court's finding that "[t]hose policies . . . state that refusal to comply with an internal investigation by the internal affairs deputy or his designee is only a grounds for dismissal or discipline if there has been an order to answer said questions."

On October 17, 2017, the Habersham County Sheriff contacted Georgia Bureau of Investigations ("GBI") Special Agent Clay Bridges to request assistance in a criminal investigation regarding the possibility that one of his staff members was going to try to smuggle methamphetamine into the jail that night. The Sheriff

3

informed Agent Bridges that his office had intercepted some jail phone calls and that "Zeigler's telephone number had been given to someone on the street for the purpose of picking up methamphetamine and bring[ing] it into the jail, and that [Zeigler's] first name . . . had actually been used in one of the conversations."

Agent Bridges met with Hannah Shearer and Jeremy Eller, who were both task force agents with the Sheriff's Office who had been assigned to the multi-jurisdictional Appalachian Regional Drug Enforcement Office. The team conducted a surveillance on Zeigler as she traveled from her home to her shift at the Sheriff's Office that evening. Agent Bridges approached Zeigler in the parking lot of the Sheriff's Office prior to her shift, asked her if she would speak with him, "told her that [he] had informed her work that she may be late[,] and asked if she would go to the administration building with [him]." That building was a separate office space in a trailer located next to the jail, where Zeigler testified she had interviewed to be hired the year before.

An audio recording of the ensuing interview was played during the *Jackson-Denno* hearing and introduced into evidence. As the trial court found,

At no time [were] *Miranda*[6] or *Garrity* warnings given to [Zeigler].

---

[6] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Initially[, Zeigler] denie[d] having ever brought contraband into the jail but this assertion change[d] when she emptie[d] her pocket and Agent Bridges discover[ed] a note that [Zeigler] claim[ed was] from [an i]nmate[.] [Zeigler] explain[ed] the content of the note (State's Exh. 2) by stating that she did on one occasion give [the inmate] a cigarette. She also confesse[d] to having used methamphetamine within the [past] month. Agent Bridges then obtain[ed] consent to search her vehicle while Agent Shearer [sat] with the Defendant. Agent Shearer and the Defendant continue[d] to speak while Agent Bridges [was] searching the vehicle and the recorder continue[d] to run. Eventually [Zeigler] admit[ted] to bringing methamphetamine into the jail and providing it to [the i]nmate.

After the interview concluded, Zeigler was arrested, and her employment was terminated.

The trial court denied the motion to suppress, finding "no evidence of any express threats" and that Zeigler's subjective belief that her job would be terminated if she did not answer the questions of Agents Bridges and Shearer was not objectively reasonable under the totality of the circumstances. That belief was specifically not reasonable, the court found, "in light of [Zeigler's] admitted understanding of the policies and [procedures] of the . . . Sheriff's Office and her belief that this was a criminal investigation."

After the trial court denied her motion to suppress, Zeigler waived her right to a jury trial, and the parties stipulated to admission at the bench trial of all evidence adduced at the *Jackson-Denno* hearing. After considering the additional evidence produced by the State at trial,[7] the court found Zeigler guilty of the counts relating to October 10, 2017 (a week before the investigation and arrest): possession of methamphetamine with intent to distribute, distribution, and conspiracy to distribute, as well as violation of the terms of her oath as a public officer by agreeing to deliver methamphetamine to an inmate and crossing the guard lines at the jail with methamphetamine on October 10.[8] This appeal followed.

> [O]nly voluntary incriminating statements are admissible against an accused at trial, and it is the State's burden to prove the voluntariness of a confession by a preponderance of the evidence. After the determination is made by the trial court that the State has met its burden and that a defendant's statement is freely and voluntarily given in

---

[7] The additional evidence primarily consisted of codefendant testimony and the recorded inmate phone calls that sparked the investigation.

[8] Prior to trial, the State nolle prossed one count each of possession of methamphetamine with intent to distribute, conspiracy to violate the Georgia Controlled Substances Act, violation of her oath as a public officer, and crossing guard lines with drugs. The trial court found Zeigler not guilty of the remaining two counts of violating her oath as a public officer.

compliance with *Jackson v. Denno*,[9] the trial court may permit the statement to come into evidence.[10]

"In reviewing a trial court's determination regarding whether a statement is voluntary, [the appellate court] defer[s] to the trial court's findings of fact unless clearly erroneous, but [the appellate court] review[s] de novo the trial court's application of the law to undisputed facts."[11] With these guiding principles in mind, we turn now to Zeigler's claims of error.

1. Zeigler argues that the trial court erred in admitting her statements into evidence and in finding that it was not reasonable for her to believe that, under the circumstances, she had to either answer questions or face termination.

In the decision of the United States Supreme Court in *Garrity*,

several police officers were the target of an investigation concerning the fixing of traffic tickets. Before being questioned by investigators, each appellant was warned "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office."

---

[9] 378 U. S. at 376-377 (II).

[10] *Colton v. State*, 296 Ga. 172, 178 (1) (766 SE2d 38) (2014).

[11] *Aiken*, 282 Ga. at 136 (2), n. 21.

7

. . . The officers answered the investigator's questions, and the answers were used against the officers in subsequent criminal prosecutions. . . . The Supreme Court concluded that the express threat of a job loss was sufficient to render the statement involuntary, holding the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.[12]

Forty years after the *Garrity* decision, the Supreme Court of Georgia, in *State v. Aiken*, discussed a split of authority that had developed regarding how to determine whether an incriminating statement was coerced in cases involving *implied* threats of job loss.[13] The *Aiken* Court declined to adopt either test and, instead, adopted a

---

[12] *Aiken*, 282 Ga. at 133-134 (1) (punctuation and footnotes omitted).

[13] *Aiken*, 282 Ga. at 134-135 (2) ("[N]umerous courts, following the lead of *United States v. Friedrick*, [842 F2d 382 (D.C. Cir. 1988),] undertake a two-part analysis that examines whether the employee subjectively believed that [she] would be fired if [she] did not answer questions and whether that subjective belief was objectively reasonable. . . . Other courts, however, relying on *United States v. Indorato*, [628 F2d 711 (1st Cir. 1980),] essentially have declined to extend the coerced testimony doctrine of *Garrity* to cases involving implied threats of job loss.").

totality-of-the-circumstances test "for determining whether the statements that a public employee makes during an investigation into [her] activities are voluntary."[14]

> In determining whether the defendant's [subjective] belief [that she could lose her job for failing to cooperate] was objectively reasonable, the court may examine whether the defendant was aware of any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate. The court may also consider whether the investigator implicitly communicated any threat of dismissal either in written or oral form; whether, before the interrogation began, the defendant was told [she] was free to leave at any time; and whether the defendant was told [she] had the right to have a lawyer present. A trial court, of course, is free to consider any other factor that it determines is relevant to the determination of voluntariness.[15]

The *Aiken* court agreed with the finding of the trial court in that case that the statement the suspect, a probation officer, gave as part of a criminal investigation into his conduct could not be used at trial against him.[16] The court concluded that,

> considered in isolation, the fact that [the suspect's] supervisor and his supervisor's boss both told [the suspect] to meet with the investigator

---

[14] *Aiken*, 282 Ga. at 135 (2).

[15] *Aiken*, 282 Ga. at 135-136 (2).

[16] See *Aiken*, 282 Ga. at 132-133, 137-138 (3).

9

would not support a finding that it was objectively reasonable for [the suspect] to believe that he was coerced into answering the investigator's questions. However, considering the directive from [the suspect's] superiors in combination with the form that the investigator had [the suspect] sign that provided that he could be fired if he interfered with the investigation "in any manner," . . . it was objectively reasonable for a person in [the suspect's] position to believe that he could be fired if he did not cooperate with the investigator. Moreover, other factors that might lead to a finding of voluntariness are not present. For example, the investigator did not inform [the suspect] of his *Miranda* rights and did not inform the suspect that he was free to stop the interview at any time.[17]

We conclude in this case that, under the totality of the circumstances, the trial court erred in finding that Zeigler's subjective belief that she would be terminated if she did not answer the agents' questions was not objectively reasonable. In making this finding, the trial court, in its written order, only pointed to Zeigler's "admitted understanding of the policies and [procedures] of the . . . Sheriff's Office and her belief that this was a criminal investigation." Under the facts of this case, we need not decide whether the Sheriff requested the agents to conduct an internal investigation

---

[17] *Aiken*, 282 Ga. at 137 (3).

10

or whether the office policies threatening termination for failure to cooperate applied to the investigation.[18]

The evidence is undisputed that Zeigler had been working at the jail for a little over a year and that she was not P.O.S.T.-certified. Thus, her lack of training and experience do not support the trial court's finding that her subjective belief was not

[18] See *State v. Thompson*, 288 Ga. 165, 168-169 (702 SE2d 198) (2010) ("We reject the State's assertion that, because the employee manual's prohibition against refusing to cooperate only applie[d] to investigations conducted by Internal Affairs, [the] subjective belief [of the defendant, who was a police officer] that he would be punished if he did not speak to [a detective from the Major Felony unit] could not be deemed to be objectively reasonable. Given the totality of the circumstances, including evidence that the Internal Affairs and Major Felony investigations were proceeding simultaneously, that [the officer] was instructed that he was not permitted to leave the scene, and that [the officer's] statements to [the detective] were included in the Internal Affairs report, we cannot say that the trial court abused its discretion in making that determination."); *State v. Stanfield*, 290 Ga. App. 62, 65-66 (2) (658 SE2d 837) (2008) ("Even though [an Internal Investigations] policy [in a policies and procedures manual distributed to all sheriff's deputies] on its face did not apply to criminal investigations, . . . considering the totality of the circumstances, . . [a deputy's] belief [that he would be terminated if he did not cooperate with a GBI agent conducting an investigation] was objectively reasonable. Although the investigating agent told [the deputy] he did not have to talk to him and was free to leave, the record shows that the investigating agent believed there was a departmental policy that required [the deputy] to cooperate with him. Moreover, the sheriff who promulgated that policy testified that it was generally applicable to all investigations and that [the deputy] could have faced termination pursuant to the policy if he did not answer the agent's question. Thus, both the agent who questioned [the deputy] and [the deputy's] boss believed that the policy required [the deputy] to answer the agent's questions. That [the deputy] would interpret the policy in a like manner is objectively reasonable under these circumstances.").

11

objectively reasonable. Although the trial court noted in its ruling from the bench that Zeigler's husband was employed as a law enforcement officer, the court acknowledged that "the length of his service and his training and what [Zeigler] would have known [as a result of her husband's service] specifically was not in evidence[.]"

Further, the agents' conduct prior to and during the interview supported Zeigler's belief that she had to answer the questions or she would lose her job. Agent Bridges approached Zeigler in the parking lot of the sheriff's office as she arrived for her shift and asked her to speak with him in a separate administrative building, telling her that he had already "informed her work that she may be late[.]" Zeigler denied that she had brought drugs into the jail for more than 20 minutes in the recorded portion of the interview. It was not until she said she loved her job and Shearer responded "*that's what we're trying to help you save*," that Zeigler admitted to bringing in methamphetamine to an inmate the prior week.

Zeigler testified that she did not understand her rights under either *Miranda* or *Garrity*. When asked whether she had heard of *Miranda* rights, she responded, "Yes. We've always heard it. I mean, it's commonly used around the jail." In its ruling from the bench, the trial court found "that [Zeigler] testified that she was familiar with the

12

*Miranda* rights, having heard them at the jail being given to, I'm assuming given at the jail, read at the jail." To the extent that the trial court relied on this factual finding in determining that Zeigler's statement was voluntary, and particularly in light of the fact that the trial court found that Zeigler was not given a *Miranda* warning, this factor does not weigh in favor of a finding of voluntariness.[19]

Our decision in *Lengsfeld v. State*,[20] relied on by the State, is clearly distinguishable. In that case, the suspect, a police investigator with 11 years of experience, met with a deputy police chief as part of an internal investigation.[21] Prior to that conversation, the suspect was advised of his *Garrity* rights and was told that the conversation was protected by *Garrity*.[22] When he arrived at the police department the following morning to take a polygraph test as part of the internal investigation, he was informed that the internal investigation had concluded and, as a result, he was

---

[19] See *Aiken*, 282 Ga. at 137 (3) (two factors that indicated that the statement of the suspect, who was a probation officer, was not voluntary were that he was not advised of his *Miranda* rights and he was not told that he was free to stop the interview at any time).

[20] 324 Ga. App. 775 (751 SE2d 566) (2013).

[21] Id. at 777-780 (1) (a).

[22] Id. at 778 (1) (a).

being placed on administrative leave pending the outcome of the GBI's criminal investigation.[23] The suspect then declined to take the polygraph test because he understood, in part from having spoken to an attorney the night before, that it would not be protected under *Garrity*.[24] "Nevertheless, [the suspect] agreed to a subsequent interview with the GBI agent, even though the agent told [the suspect] that he was conducting a criminal investigation."[25] Therefore, this Court affirmed the trial court's ruling that *Garrity* did not require suppression of the suspect's statements to the GBI agent.[26]

By contrast, Zeigler had no investigatory experience, she had only been employed in law enforcement for 15 months, worked in the front office of the jail, and she was never advised of her rights under either *Garrity* or *Miranda* before Agent Shearer indicated to her that cooperation would help save her job. In light of the foregoing, we conclude that the trial court erred in admitting Zeigler's statements.

---

[23] Id.

[24] Id.

[25] Id.

[26] Id. at 781 (a) (a).

14

Thus, we reverse and remand the case to the trial court with direction to grant Zeigler's motion to suppress.

2. Given our holding in Division 1, supra, we need not address Zeigler's remaining argument.

*Judgment reversed and case remanded with direction. Miller, P. J., and Markle, J., concur*.