**FIFTH DIVISION**
**MCFADDEN, C. J.,**
**MCMILLIAN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 30, 2019**

# In the Court of Appeals of Georgia

A19A1398. BELL v. THE STATE.

MCMILLIAN, Presiding Judge.

Following a jury trial in October 2015, David R. Bell was convicted of one count of aggravated sodomy, one count of aggravated sexual battery, four counts of sexual assault against a person in custody, and two counts of violation of oath by a public officer arising from his conduct while employed as a detention officer with the Newton County Sheriff's Office.[1] The trial court sentenced Bell to a total of life, with 25 years to be served in confinement. Bell now appeals the denial of his motion for new trial, challenging the sufficiency of the evidence on his aggravated sodomy conviction and asserting that he received ineffective assistance of counsel when his trial counsel failed to object to the trial court's jury instructions; failed to object to testimony that improperly bolstered the credibility of one of the victims; and failed

---

[1] The jury acquitted Bell of one count of aggravated sodomy and one count of sexual assault against a person in custody as charged in Counts 1 and 5 of the indictment.

to object to the admission of his statement made to his employer. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the evidence at trial showed that A. D. was arrested on May 10, 2013, and brought to the Newton County jail where Bell worked as a detention officer. A. D., who had a broken arm at the time, was moved to the jail's medical unit on May 12. The medical unit is in an area separate from the rest of the inmate housing, and A. D. was placed in a cell at the end of a long hall with one other cell mate, S. H. That day, Bell, who was dressed in uniform, walked by their cell before returning to ask if they needed anything. Bell said he had just finished taking the inmate workers out and offered to take A. D. and S. H. to the showers in the medical hallway.

While her cell mate was still in the shower, A. D. asked for a blanket to prop up her arm, and Bell asked what she could do for him. A. D. told him that she had just gotten there and had not been to the commissary store. Bell then walked in and lifted up her shirt. Bell told her that he was the officer and that whatever was about to happen, no one would believe her over him and that if she did say anything, she would get more time and would not see daylight for a while. He then groped her

_____

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2

breasts and put his hands down her pants.[3] A. D. was crying and told him "no," but Bell kept repeating that it did not matter what she said, he was an officer and was going to have his way with her, and there was nothing she could do about it.[4]

At trial, A. D. testified that Bell "just kept on forcing himself on [her]" until S. H. came out of the shower and asked to use the phone.[5] While S. H. was away making a phone call, Bell returned to the cell and pulled A. D.'s pants down to her ankles. He then pulled his penis out, rubbed it on her mouth, and tried to make her perform oral sex on him while he rubbed her breasts. When she refused, he inserted his fingers inside of her vagina and tried to get her to bend over. A. D. "tried to push him off [her] a couple times," but he kept saying that he was an officer and if she did not do what he told her, she would end up in trouble. He also told her that he was going to try to come back to work the third shift and finish what he started.

---

[3] A. D. testified that she was wearing only the jail-issued uniform, which consisted of a red shirt and red pants and had not yet been able to obtain a bra or underwear, which inmates are required to purchase or obtain independently.

[4] A. D. also testified that Bell put his mouth on her vagina, but Bell was acquitted of Counts 1 and 5 relating to that act.

[5] A. D. asked S. H. not to leave her because Bell was making a pass at her, but S. H. wanted to make a call to get out on bond. Bell then took S. H. all the way to intake to use the phones there instead of the phone in the medical unit.

3

Eventually, she was able to stand up and run to the corner where she screamed at him that this could not happen. At that point, Bell pulled his pants back up and left. A. D. reported the incident the following day when she heard a female officer in the hall.

Investigator Robert Gaddy, who was assigned to investigate A. D.'s complaint, interviewed A. D. on May 13, 2013. Gaddy described A. D. as "very upset" and said that she was shaking and crying during the interview. At the time that he was interviewing A. D. and S. H., Gaddy noticed Bell upstairs in the criminal investigations division, which he found unusual because he rarely saw any detention officers upstairs in that part of the building unless they were there to see someone, and he had never seen Bell there. He later tried to check the camera footage for the relevant time period, but found that there were no cameras recording in that area of the medical ward. As part of his investigation, Gaddy also located the duty assignments for detention officers on May 12 and determined that Bell was the only officer assigned to the medical unit at that time. At trial, Gaddy explained that detention officers in Newton County take an oath of office upon hire, and a copy of that oath was admitted into evidence.

Before Gaddy began his interview of Bell, he informed Bell that there were no charges against him and that he was free to leave at any time. Bell then agreed to give

4

a voluntary statement. After Bell made an incriminating statement – in which he admitted to having seen A. D.'s breasts – Gaddy stopped the interview to read Bell his *Miranda* rights and to provide him with a form outlining those rights. After reviewing his rights and initialing and signing the *Miranda* form, Bell agreed to continue his statement.

Bell initially stated that A. D. lifted her top and showed her breasts but that he left without touching her. He later admitted returning to A. D.'s cell various times to talk to her and stated that when A. D. lifted her shirt again, he squeezed her breasts and played with her nipples on two separate occasions. He denied performing oral sex on A. D., trying to force her to perform oral sex on him, or putting his hands down her pants. He eventually stated that A. D. had tried to kiss him and had tried to rub her hand on his penis, but that he stepped back because he knew that he had already crossed a line.[6] At the conclusion of the interview, Bell was placed under arrest.

On May 16, 2013, K. L. came to the Newton County's Sheriff's Office to report that Bell has sexually assaulted her when she had been an inmate there in 2012. At trial, K. L. explained that after she had been arrested in 2012, she could not get in contact with anyone and was distraught and crying. She noticed that Bell kept

---

[6] A redacted recording of this statement was played for the jury.

walking back and forth in front of the holding cell until he eventually opened the door and asked her what was wrong. He then offered to contact her parents on his cell phone. While he was dialing, she was ordered to go across the hall to change into a jail-issued uniform. Bell opened the door to the changing room to tell her that he could not get in touch with her parents either.

While K. L. was back in the holding cell, Bell returned and asked her how much her bond was and how much money she had on her. K. L. told him that her bond was $200 but that she only had $30 on her. Bell said that he knew A&J Bail Bonding really well and that he would personally put $70 with her $30 and that she could go to A&J Bail Bonding the next day and pay the other $100. She agreed to sign a form permitting Bell to access her belongings to retrieve the $30, and Bell said he would call the bond company. Bell then walked her down to the medical unit and told her that he wanted sexual favors in exchange for helping her out and specifically said that he wanted "head." K. L. told him that she just wanted out. When he put his hands up her shirt and touched her breasts, K. L. flung him off. He then tried to put his hands down her pants, but she was able to stop him.

K. L. then met with a bondsman, who told her that he was only helping her because he was close friends with Bell and that she had to pay the other $100 the next

6

day or he would revoke her bond. When she was finally released, Bell was waiting for her and asked her for her phone number. He tried to "grab on [her] butt and stuff," but she pushed him away. When she got into the car with her family, she told them what had happened. The next day, her grandfather took her to pay the remaining $100 for the bond, but nobody was in the office, so her grandfather decided to return later to make the payment. However, she later saw her grandfather rip up the check. She was never contacted by anyone at A&J Bail Bonding to make any further payments on the bond.

K. L. testified at trial that she did not report what happened that day because she was too terrified and upset and just wanted to get home. And although she did tell her family, she had asked them not to report it to anyone. She explained that she was dealing with a lot of issues at the time and just wanted to put it all behind her. However, she later read a newspaper article about Bell that made her think the police should know what Bell had done to her.

Investigator Jeff Alexander interviewed K. L. following her report that Bell had sexually assaulted her while she was an inmate. He was able to determine that Bell was working as a "float" on the day that K. L. was arrested and that his duties would have included moving inmates from one spot in the jail to the next. Alexander

7

concluded that there were no cameras recording in the specific area of the hallway where K. L. described the sexual assault. Alexander also contacted A&J Bail Bonding and was notified that K. L.'s bond was still over $100 short.

Richard Johnson, who works at A&J Bail Bonding, testified that Bell called him on May 10, 2012, and told him he had a friend he needed to get out of jail. He met Bell in the jail parking lot, took the money, and left after Bell told him he would pay the rest of it later. The owner of A&J Bail Bonding testified that the following day, K. L.'s grandfather showed up at his office and was upset. Over the course of their discussions, the grandfather decided that he was not going to pay the bond fee. The owner then contacted Bell and told him what had transpired with K. L.'s grandfather and advised Bell not to have any more contact with K. L. At some point, an anonymous $25 payment towards K. L.'s account was dropped into the mail at his office. After Bell was convicted, this appeal followed.

1. We begin with Bell's challenge to the sufficiency of the evidence on his conviction for aggravated sodomy.

Georgia law defines sodomy as "any sexual act involving the sex organs of one person and the mouth or anus of another." OCGA § 16-6-2 (a) (1). "A person commits the offense of aggravated sodomy when he or she commits sodomy with

force and against the will of the other person or when he or she commits sodomy with a person who is less than ten years of age." OCGA § 16-6-2 (a) (2). Bell was charged in Count 2 with committing aggravated sodomy by performing "a sexual act with the person of [A. D.] involving the sex organs of the accused and the mouth of said person, said act having been performed with force and against the will of said person."

A. D. testified that as she was sitting on the edge of the bed, Bell "pulled his penis out and he rubbed it across [her] lips trying to get [her] to have oral sex with him." She also stated several times that "he rubbed [his penis] across [her] mouth." Bell maintains, however, that there is no evidence that his penis penetrated A. D.'s mouth past her lips, and therefore, the State could not prove sodomy. We disagree.

Georgia law does not require penetration in order to prove sodomy. See *Adams v. State*, 299 Ga. App. 39, 40 (1) (681 SE2d 725) (2009) (although evidence showed that the defendant "put his private on her butt," penetration is not an element of sodomy or aggravated sodomy and the state is not required to prove penetration to support an aggravated sodomy charge); *Green v. State*, 249 Ga. App 546, 549 (1) (b) (547 SE2d 569) (2001) ("Proof of penetration is not required for a conviction of sodomy. All that is required is some contact.") (citation omitted). And in multiple

9

cases, we have specifically found that where the defendant made contact with his penis and the victim's lips, the evidence was sufficient to sustain a conviction for sodomy. See *Jones v. State*, 343 Ga. App. 180, 180-81 (1) (806 SE2d 631) (2017) (evidence that defendant placed his penis on the victim's lips sufficient to support his conviction for aggravated child molestation by act of sodomy); *Williams v. State*, 284 Ga. App. 255, 256-57 (1) (a) (b) (643 SE2d 749) (2007) (where victim testified defendant touched her lips with his penis, evidence was sufficient to sustain his conviction for aggravated sodomy); *Turner v. State*, 231 Ga. App. 747, 747-48 (1) (500 SE2d 628) (1998) (where evidence showed that the 14-year-old victim kissed the defendant's penis, evidence was sufficient to sustain his conviction for sodomy). See also *Nguyen v. State*, 296 Ga. App. 853, 854 (676 SE2d 246) (2009) (defendant's conviction for aggravated child molestation by act of sodomy upheld where evidence showed defendant "placed his lips on [the victim's] private part").

Because A. D. testified that Bell forcibly rubbed his penis on her lips and mouth, we find that the evidence was sufficient to enable a rational trier of fact to find the essential elements of the crime of aggravated sodomy beyond a reasonable doubt.

2. Bell also asserts that he received ineffective assistance of counsel on three grounds. In order to succeed on his claim of ineffective assistance, Bell must prove

10

both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Bell is required to show that his trial counsel "acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms." *Haney v. State*, 305 Ga. 785, 790 (2) (827 SE2d 843) (2019). To prove prejudice, Bell is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). "This burden is a heavy one." (Citation omitted.) *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if Bell fails to satisfy either part of the *Strickland* test, we need not examine the other part. *Brown v. State*, 302 Ga. 454, 457 (2) (807 SE2d 369) (2017). In reviewing the trial court's decision, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

11

(a) Bell first asserts that his trial counsel rendered ineffective assistance by failing to object to the trial court's jury instruction that he alleges discharged the State's burden of proving the lack of consent, an essential element of aggravated sodomy and aggravated sexual battery. "To determine whether a jury charge is likely to have misled or confused the jury, we must consider the charge as a whole, reading all of its parts in conjunction with each other." (Citation and punctuation omitted.) *Wilhite v. State*, 337 Ga. App. 324, 326 (1) (b) (787 SE2d 293) (2016).

Bell points us to the following portion of the trial court's charge:

> The law provides that a person in custody is legally incapable of giving consent to having sexual contact with an individual who has supervisory authority over her. The willingness of the alleged victim to participate in sexual contact with the accused shall not be a defense to a charge of sexual assault to a person in custody.

On appeal, Bell argues that his trial counsel should have objected because the trial court did not clearly limit this instruction to the applicable charges. However, the instruction itself specifically limited its application to the "charge of sexual assault to a person in custody" and came directly after the trial court defined that specific crime:

12

A person who has supervisory authority over another individual commits sexual assault when that person is an employee or agent of a law enforcement agency or correctional facility and engages in sexual conduct with such individual who the actor knew or should have known is in the custody of such facility or is being detained by or is in custody of any law enforcement agency.

Moreover, the trial court separately charged the jury as to the elements of aggravated sodomy and aggravated sexual battery, including the elements of force and lack of consent:

A person commits the offense of aggravated sodomy when that person performs a sexual act involving the sexual organs of one and the mouth of another *with force and against the will of the victim. The state must also prove the element of force beyond a reasonable doubt.* Force may consist of acts of physical force, threats of harm or intimidation.

A person commits the offense of aggravated sexual battery when he intentionally penetrates with a foreign object the sexual organ of another person *without the consent of said person.*[7] (Emphasis supplied.)

---

[7] The indictment and a copy of the entire jury charge were also sent out with the jury. The subject of each charge included a bold heading, and the heading of the charge Bell complains of reads, "**Sexual Assault of a Person in Custody – Consent of Victim.**"

And "where, as here, a defendant complains of the juxtaposition of correct statements of law in the charge to the jury, we apply the usual rule that they must be read in context of the whole jury charge." *Blackwell v. State*, 302 Ga. 820, 823 (2) (809 SE2d 727) (2018). Having reviewed the trial court's charge as a whole, we conclude that the charges properly covered the applicable principles of law and did not erroneously relieve the State of its burden of proving an essential element of either aggravated sodomy or aggravated sexual battery. Accordingly, Bell cannot show that his trial counsel's failure to object constituted deficient performance. See *Wilhite*, 337 Ga. App. at 326 (1) (a).

(b) Bell also argues that his trial counsel's performance was deficient in failing to object to testimony that improperly bolstered A. D.'s credibility.

OCGA § 24-6-620 provides that "[t]he credibility of a witness shall be a matter to be determined by the trier of fact[.]" Thus, "[a] witness, even an expert, can never bolster the credibility of another witness as to whether the witness is telling the truth." (Citation omitted.) *Adkins v. State*, 301 Ga. 153, 158 (3) (a) (800 SE2d 341) (2017). When evaluating whether testimony constitutes improper bolstering, "we consider the disputed testimony in context" and "[w]hen a witness's statement does not directly

14

address the credibility of another witness, . . . there is no improper bolstering." *Brown v. State*, 302 Ga. 454, 460-61 (2) (b) (807 SE2d 369) (2017).

Bell cites the following exchange during the State's direct examination of Gaddy:

Q: And during the course of your interview, did you make plans to, well, let me – from your observation of [A. D.]'s conduct and demeanor while she was describing these events to you, did you believe that you were investigating a case where she was giving her verbal or actual consent for acts to take place?

A: No. I, from the interview and listening to her and watching her demeanor, everything that allegedly happened that day between her and Detention Officer Bell was unwanted, no consent given by her at all.

Q: If she had come in and told you, I told him that he could do this act or that act that had described acts of a sexual nature occurring, would you have continued your investigation into the case?

A: I would.[8]

Read in its context, Gaddy's testimony showed that based on the information supplied to him during his investigation, he proceeded to investigate a type of case

---

[8] The trial court overruled defense counsel's objection on the ground that the question asked for a conclusion of law.

in which an inmate alleged that she had not given her consent to the sexual acts and that he would have continued an investigation even if the inmate had told him the sexual acts were consensual. He did not testify that he believed A. D. was telling the truth and specifically couched his investigation in terms of "everything that *allegedly* happened." This testimony does not constitute improper bolstering.[9] See *Abney v. State*, 306 Ga. 448, 455 (3) (b) (831 SE2d 778) (2019) (where detective did not speak directly to witness's truthfulness but was instead responding to questions about the manner in which he conducted his investigation, no improper bolstering). Accordingly, any objection to Gaddy's testimony as improper bolstering would have been meritless, and the "failure to make a meritless objection cannot support a claim of ineffective assistance." (Citation and punctuation omitted.) *Harris v. State*, 304 Ga. 652, 658 (2) (c) (821 SE2d 346) (2018).

(c) And lastly, Bell asserts that trial counsel rendered ineffective assistance by failing to object to the admission of his statement to Gaddy. "In reviewing a trial court's determination regarding whether a statement is voluntary, we defer to the trial court's findings of fact unless clearly erroneous, but we review de novo the trial

---

[9] Bell's trial counsel also testified at the motion for new trial hearing that she characterized Gaddy's testimony as an explanation of the nature of the claim he was investigating.

court's application of the law to [the] undisputed facts." *State v. Aiken*, 282 Ga. 132, 136 (2), n.21 (646 SE2d 222) (2007).

Bell asserts that his trial counsel should have moved to exclude the statement under *Garrity v. New Jersey*, 385 U.S. 493 (87 SCt 616, 17 LE2d 562) (1967). In *Garrity*, the United States Supreme Court held that statements obtained under the threat of removal from office or government employment cannot be used in a subsequent criminal investigation. *Garrity*, 385 U.S. at 497-98. In applying *Garrity*, Georgia courts employ a totality-of-the-circumstances test to determine whether statements made by a public employee during an investigation into his activities are voluntary. See *Aiken*, 282 Ga. at 135 (2).

Our Supreme Court has enunciated several factors that may be considered under the totality-of-the-circumstances test, including

> whether the State actor made an overt threat to the defendant of the loss of his job if he did not speak with investigators or whether a statute, rule, or ordinance of which the defendant was aware provided that the defendant would lose his job for failing to answer questions. If no express threat is present, the court may examine whether the defendant subjectively believed that he could lose his job for failing to cooperate and whether, if so, that belief was reasonable given the State action involved. In determining whether the defendant's belief was objectively reasonable, the court may examine whether the defendant was aware of

17

any statutes, ordinances, manuals, or policies that required cooperation and provided generally, without specifying a penalty, that an employee could be subject to discipline for failing to cooperate. The court may also consider whether the investigator implicitly communicated any threat of dismissal either in written or oral form; whether, before the interrogation began, the defendant was told he was free to leave at any time; and whether the defendant was told he had the right to have a lawyer present. A trial court, of course, is free to consider any other factor that it determines is relevant to the determination of voluntariness.

(Footnotes omitted.) *Aiken*, 282 Ga. at 135-36 (2).

Bell conceded below that there was no direct threat of termination. However, he testified that he believed he was being asked to cooperate in an internal affairs investigation and that if he did not answer Gaddy's questions, he would face possible termination.[10] At the motion for new trial hearing, the State introduced evidence showing that the Newton County Sheriff's Office has an Office of Professional Standards, which uses internal affairs investigators to investigate administrative policy violations. That office is separate from the Criminal Investigations Division,

---

[10] Bell's trial counsel testified that she did not recall Bell expressing any concerns that he felt forced to give the interview or feared that he would be fired if he did not. If he had said that, she would have researched whether a motion to suppress should be filed. She did not have any concerns about the voluntariness of the statement after she reviewed the recorded statement.

18

whose officers investigate criminal activity. The Office of Professional Standards is in a different area of the building, separated by walls and heavy doors. Michael Cunningham, a Sergeant in the Office of Professional Standards, explained that if an employee of the Newton County Sheriff's Office was called in by internal affairs regarding an internal investigation, the employee is compelled to answer those questions. Prior to beginning such an interview, the employee is read his *Garrity* rights. If an employee refuses to cooperate in an internal affairs investigation, the employee is subject to discipline, including termination.

In this case, Cunningham received a report that an inmate had made allegations of inappropriate sexual behavior by Bell. When he received that information, he determined that the allegations were of a criminal nature and contacted the commander of the Criminal Investigations Division to request a criminal investigation, which he explained is different from an internal affairs investigation. Cunningham testified that Bell would not have been subject to disciplinary action if he had refused to participate in the criminal interview; the criminal investigation would have continued to obtain evidence in other ways. He also testified that he is not aware of any policy, culture, or statement that an employee could be subject to discipline or termination for failing to participate in a criminal investigation.

19

Gaddy also testified at the new trial hearing and confirmed that before the interview began, he told Bell he was not required to be there and was free to leave at any time. At no point during the interview did Bell express any concerns about disciplinary action or the safety of his job, nor did Bell indicate that anyone had required him to be there or that he felt forced or compelled in any way to speak with Gaddy. Gaddy explained that he was not aware of anyone who had faced disciplinary action or lost his or her job based on a refusal to answer questions in the context of a criminal investigation.

The evidence also showed that Bell had worked as a Newton County Sheriff's Office detention officer for seven years at the time he gave his statement to Gaddy. And Bell acknowledged that he had personally received and "thoroughly read" a copy of the Newton County Sheriff's Office Standard Operating Procedures and the Office of Professional Standards manual on July 11, 2012.

In reviewing these manuals, Bell was familiar with the discussions of *Garrity*, including the following statement in Paragraph 2.1.16 of the Office Standard Operating Procedures:

*Garrity vs. New Jersey:* is the landmark U.S. Supreme Court decision which sets forth the protections afforded to public safety personnel when

20

they are compelled to give a statement which could expose them to criminal liability. It holds that nothing that is disclosed in an internal affairs statement can be used criminally against the employee, except in the case of perjury. Statements can be used in subsequent disciplinary actions.

Paragraph 3.4 of the Office of Professional Standards manual also provides:

> After being properly advised of their *Garrity* rights, all employees must answer questions and/or make available any relevant materials or statements concerning an investigation of employee misconduct when directed to do so by a disciplinary authority or duly appointed investigator.

> Employees will provide all relevant information, materials and answer all questions honestly, completely, to the best of their ability, in a respectful and cooperative manner.

> An employee's refusal to fully cooperate and provide statements, complete answers and relevant materials, or who fails to truthfully answer questions, withholds material facts, becomes belligerent, argumentative, or otherwise obstructs an authorized administrative investigation will face disciplinary action, up to and including dismissal.

Paragraph 5.1.8 of the Office of Professional Standards manual provides:

**Prior to commencing any interview, every employee who is the subject/suspect in an internal investigation shall be advised that the Garrity rule is being evoked and they shall be made aware of their rights as defined by the U.S. Supreme Court case of *Garrity vs. New Jersey*.**

They shall also be made aware that they must cooperate with the interviewer in a timely manner and that untruthful statements could result in the revocation of Garrity protection from criminal prosecution and could lead to disciplinary action up to and including termination of their employment. They shall also be made aware that the contents of their statements must be kept confidential, and that such statements may be made known only to their attorney, if represented.

Failure to comply with this confidentiality requirement may result in additional disciplinary action up to, and including termination.

At the time Bell gave his statement, which took place in the Criminal Investigations Division, he was aware that Gaddy worked in the Criminal Investigations Division and conducted interviews as part of his criminal investigations. Bell also conceded that Gaddy never told him that he was conducting an internal affairs investigation. And knowing that he was free to leave, and that none of the standard internal affairs interview procedures were being followed that would require his cooperation, Bell was asked an open ended question, "Tell me what

22

happened down in medical yesterday." In his lengthy response, Bell eventually stated that A. D. showed her breasts to him. Because this statement was potentially incriminating, the interview was stopped and a Newton County Sheriff's Office Criminal Investigations Division Miranda Rights Waiver Form was presented to Bell, which he initialed and signed. After being told that there was a possibility that he could be criminally charged, Bell agreed to continue speaking with Gaddy.

Giving due deference to the trial court's findings in its well-written and thorough order denying the motion for new trial, we find no abuse of discretion in the trial court's determination that any subjective belief held by Bell that he would face termination for failing to answer the questions was unreasonable. Bell knew he was being asked to give a voluntary statement as part of a criminal investigation;[11] he knew that he was not required to submit to a criminal investigation; and he knew that the policy manuals provided for his termination only upon refusal to cooperate with an internal affairs investigation. Accordingly, because Bell's statement was

---

[11] For this reason, we reject Bell's argument that he was questioned in violation of *Missouri v. Seibert*, 542 U.S. 600 (124 SCt 2601, 159 LE2d 643) (2004). *Seibert* condemned an interrogate-first-warn-later technique "designed to circumvent *Miranda v. Arizona*, 384 U. S. 436 [86 SCt 1602, 16 LE2d 694] (1966). It undermines the *Miranda* warning and obscures its meaning." *Seibert*, 542 U.S. at 618 (Kennedy, J., concurring in the judgment). *Miranda* warnings are required "before custodial questioning." *Seibert*, 542 U.S. at 608 (II). Bell was not in custody.

23

voluntarily and freely given, it was admissible at trial and his trial counsel was not ineffective in failing to seek its exclusion. See *Holzheuser v. State*, 351 Ga. App. 286, 292-94 (1) (b) (i) (828 SE2d 664) (2019) (where defendant was notified that he was free to leave at any time and could not point to any regulation requiring him to submit to the interview process, an objection pursuant to *Garrity* would not require exclusion of the interview).

*Judgment affirmed. McFadden, C. J., and Senior Appellate Judge Herbert E. Phipps concur.*