In the Supreme Court of Georgia

Decided:   November 17, 2014

S14A0703.  COLTON v. THE STATE.

HINES, Presiding Justice.

This is a second appeal by convicted murderer Tyus Colton following a ruling by the trial court, upon remand, that his confession which was in evidence at his trial was voluntary.   For the reasons which follow, we affirm such judgment by the trial court as well as Colton's judgments of conviction.

A. *Procedural History*

A jury found Colton guilty of malice murder, felony murder, aggravated assault, and aggravated battery in connection with the 2002 beating death of Shannon Blount, and he was sentenced to life imprisonment.  In a prior direct appeal to this Court from his convictions, Colton contended that his confession was erroneously admitted into evidence at trial without a preliminary finding by the trial court that the confession was voluntary, and that the trial court erred by allowing police officers to testify regarding two separate statements made to

them by non-testifying co-defendant Rayford Bussie[1] that incriminated Colton because the admissions violated the Confrontation Clause of the Sixth Amendment. See *Colton v. State*, 292 Ga. 509 (739 SE2d 380) (2013).

This Court found that there was sufficient evidence to enable a rational trier of fact to find Colton guilty beyond a reasonable doubt of the crimes for which he was convicted; however, it was necessary to remand the case to the trial court for a proper consideration of whether Colton's confession was made voluntarily because although the jury made the express finding on the verdict form that the confession was indeed voluntary, the trial court failed to make a preliminary and conclusive finding in that regard. Id. at 513 (3). This Court also determined that Bussie's custodial statement made to police several months after the murder was admissible at trial because it did not name Colton specifically or imply that it was Colton who was involved in the crimes, and the trial court had specifically instructed the jury that it could not consider any custodial statements by Bussie that incriminated Colton. Id. at 511 (2). As to Bussie's non-custodial statement made to police on the day of the murder, we

---

[1]Bussie, who is Colton's uncle, was tried with Colton and acquitted of all charges.

2

determined that the admission of this statement violated Colton's Sixth Amendment rights; but, the error might be harmless if the admission was cumulative of other evidence. Id. at 512 (2). However, this Court could not yet address such issue because the trial court had to first make a finding on the voluntariness of Colton's confession.

Following remand, the trial court held a hearing on June 21, 2013, at which Colton argued that his confession was not voluntary in that he could not understand or effectively waive his *Miranda*[2] rights because of his low intelligence quotient ("I.Q."). At this hearing, the trial court considered evidence and argument that had been presented at a pre-trial *Jackson v. Denno*[3] hearing. On July 30, 2013, the trial court issued an order finding that Colton was advised of each of his *Miranda* rights, that he understood these rights, that he voluntarily waived them, and that thereafter he gave his confession freely and voluntarily without any hope of benefit or fear of injury. The trial court

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[3] *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

3

additionally found that Colton's I.Q. did not prevent him from understanding his rights and knowingly waiving them.

## B. Facts Regarding the Murder

The evidence construed in favor of the verdicts showed the following. On November 28, 2002, Colton, the victim Shannon Blount, Bussie, Derrick Cameron, and Curtis Addie attended a house party. The five men left the party and walked to a car belonging to Bussie's girlfriend, with Colton and Blount getting into the backseat. Colton and Blount began fighting about a broken window in the car, for which Bussie and Colton believed Blount was responsible. Cameron and Addie broke up the fight, and Cameron then got out of the car and left with someone else. The fight between Colton and Blount resumed. Blount attempted to walk away, but Colton pursued him. Colton started "whipping [Blount] real bad . . . kicking [Blount], stomping and beating on [Blount]." Colton got on top of Blount and continued beating and punching him while he was on the ground. Colton was on top of Blount for one to two minutes. Colton beat Blount with a folding chair, choked him, kicked him in the head and chest while Blount was on the ground, and smashed Blount's head

4

with a rock.  Blount was left bloodied and beaten on the ground. Bussie and Addie had walked to Addie's aunt's house so Bussie could use the telephone. When Bussie and Addie returned to the car, Colton was sitting in the front seat of the car and Blount was lying face down on the ground.

A relative of Colton's who lived nearby saw the bloody Blount lying on the ground.  She went to her home to get her brother, and when the two returned to where Blount lay injured, they found Colton, Bussie, Addie, and another man standing nearby.  None of the men standing appeared to be injured, including Colton. The relative returned to her home to call 911, and Bussie accompanied her; Bussie was crying and saying that Colton had attacked Blount.

Emergency personnel responded to the scene, where they observed a folding chair on the ground with blood on it, approximately five feet from Blount. They found Blount unresponsive and lying on his back with numerous lacerations to his face and several broken teeth.  He was alive but unconscious. While transporting Blount to the hospital, they received another emergency call about a car wreck, and they responded to it. They found Colton, injured and outside of his vehicle.  The intoxicated Colton had left the crime scene and

5

crashed his car, leaving him bleeding from his face and hands. Colton was crying, but was able to climb unassisted into the same ambulance with Blount, and was taken to the hospital along with him. Upon arrival at the emergency room, Colton was found to have facial lacerations and contusions, and a fractured nose. He was obviously intoxicated, and very aggressive and combative with the staff. Blount remained unresponsive and died from his injuries shortly after arriving at the hospital.

Blount had sustained bruising to the left side of his forehead, several lacerations around his left eye, and extensive bruising and lacerations around his mouth. His mandibular bone, maxillary bone, and hyoid bone were fractured. Several of his teeth were dislocated and at least one tooth was missing. There were no physical indications that he had punched anyone. Blount died as the "result of asphyxia by manual strangulation compounded by blunt force trauma to the head."

A tennis shoe collected from Colton at the hospital had blood on it, and the blood matched Blount's. Blood on the folding chair found near Blount matched Blount's DNA.

### C. Colton's Confession to Police

Police interviewed Colton on November 29, 2002, at the Meriwether County Detention Center upon his release from the hospital. He was advised of his *Miranda* rights, and he executed a written waiver of them. Colton then gave a statement, which was typed by an officer and signed by Colton, in which initially, Colton related that another man at the party inquired if Blount "had some money in his pocket," and asked Colton to help him rob Blount. Colton responded that he would help in the robbery "if [Blount] has some money in his pocket." Colton then explained that the fight with Blount started because Colton refused to give Blount a ride home and because Colton believed that Blount had thrown a rock through Bussie's girlfriend's car window. Colton described the deadly altercation: after Colton accused Blount of busting out the car window, Blount "swung" at him and they started fighting; Bussie told them to stop fighting and to get in the car; Colton got into the front passenger seat and Blount got into the back; Blount hit Colton in the back of the head and Colton got into the back seat and started fighting; Cameron "pulled [Colton] off" Blount and out of the car; Addie then told Colton to "beat that 'm _ _ _ _ _ f _ _ _ _ _' down";

Blount came after Colton and the fighting resumed; Colton grabbed Blount "by the neck" and started hitting him in the face; the two fell to the ground with Colton admitting, "I was holding [Blount] by his throat with my left hand and hitting [him] in the face with my right hand"; Bussie pulled Colton off Blount and Colton started to leave, but then he saw Blount trying to get up; Colton grabbed what looked to him like a stroller from the car trunk and hit Blount in the head and chest with it; after Colton hit Blount and when Blount was still lying on the ground, Colton and the man who had proposed robbing Blount went through Blount's pockets; Colton saw the man pull "something green" out of one of Blount's pockets; Colton covered Blount with a blanket; and then Colton ran to his father's house, took his car, and "wrecked it down the road."

### D. *Evidence Presented at the Jackson v. Denno Hearing*

In support of his claim that his intellectual impairment prevented him from understanding and knowingly waiving his rights, Colton offered the testimony of a special-education consultant with the Coweta County School Board as the custodian of Colton's educational records. The consultant acknowledged that she did not know Colton personally but only through his school records, which

8

contained his educational and psychological evaluations from kindergarten until tenth grade. She testified on direct examination: Colton had received special education services since the age of five as a student who tested at an early age as one with "moderate intellectual disability," which was defined as having an I.Q. of 55 or below; Colton was re-evaluated at age 16 and scored an overall intellectual potential of 62, with verbal skills measuring 59, and "performance" or nonverbal reasoning measuring 67, resulting in a re-classification of him as "mildly intellectually disabled"; his reading and writing capabilities tested at the elementary school level, which meant that he would have difficulty with complex words and directions and would have to move slowly through information. However, on cross and re-direct examination, the consultant testified that Colton's I.Q. could have improved with age; that his ability to understand and comprehend ordinary discussions was different than taking an I. Q. test and that ordinary language might not pose a problem; the classification of "mild intellectual disability" was in the "top range" of the scale of mental retardation; Colton could have improved his word comprehension since his last testing; Colton had taken other I.Q. tests with resulting scores ranging from 66

to 72, which would be in the "borderline or mildly intellectually disabled range"; Colton may have had difficulty understanding certain words used in the *Miranda* warnings, such as "appointed," "exercise," and "waiver," but that Colton would have been able to understand the phrases, "you have the right to remain silent" and "if you cannot afford a lawyer"; and that Colton might have had problems with the terms "waived" and "willingly," as used in the sentences, "I have read the above statement of my rights and I understand each of these rights. Having these rights in mind, I waive them and willingly make a statement," but that he had strength in "self-related self-help behavior," i.e., asking for help or clarification, especially with family and those familiar to him.

Colton also offered testimony from his mother that he was in special education classes throughout his schooling and that it was common for her to have to tell him things more than once. She testified that she believed that Colton was heavily medicated at the hospital, and that the day after he was admitted he was in and out of consciousness; nevertheless, she told him that she would hire a lawyer (which she did not), and gave him explicit instructions not to say anything. She further acknowledged that she had "normal, everyday

interaction" with Colton when he was living with her, and that when he did not understand something, he would tell her so.

The State presented evidence[4] that at the Meriwether County Detention Center, Colton was informed of the charges against him and why he was in jail; Colton, who was seventeen at the time, was advised of his *Miranda* rights, which were explained to him with the assistance of a *Miranda* form; an officer read the *Miranda* form to him; the officer testified that it was his "practice . . . to make sure that [suspects] understand what [is] going on [or] know what [is] happening," and that he was comfortable with Colton's understanding of his *Miranda* rights; of his own free will, Colton initialed the form next to each of the *Miranda* rights and signed his name after the waiver was read to him; Colton never indicated a lack of understanding, and indeed, appeared to understand; Colton was also asked general questions about his identity, address, social security number, and level of  education, and he supplied the requested information, including that he had completed the tenth grade; Colton did not appear confused, and he indicated that he understood his rights; he did not ask

_____

[4]The police interview of Colton was neither audio nor video recorded.

11

officers any questions about his rights or for assistance and appeared awake and alert; Colton did not ask for anything, including an attorney; it did not appear there was anything wrong with Colton; in response to officers' inquiries, Colton stated that he was not given any medication when he was discharged from the hospital; he appeared to be coherent, not under the influence of any medications or alcohol, was laughing with officers, and seemed fine; he was not threatened or promised any benefit; initially, Colton denied any involvement in the victim's death, but he later stated that he wanted to "go ahead and get it out of the way" and make a statement; Colton asked an officer to type his statement, which was read back to him and which he then signed; and at the conclusion of the 2-3 hour interview, Colton told officers that he did not mean to hurt the victim. In response to defense questioning, an interviewing officer testified that he would be surprised to learn that Colton had an I.Q. of 69 because of Colton's exhibited understanding of what was said to him.

1. Certainly, only voluntary incriminating statements are admissible against an accused at trial, and it is the State's burden to prove the voluntariness of a confession by a preponderance of the evidence. *Currier v. State*, 294 Ga.

12

392, 398 (3) (754 SE2d 17) (2014).  After the determination is made by the trial court that the State has met its burden and that a defendant's statement is freely and voluntarily given in compliance with *Jackson v. Denno*, the trial court may permit the statement to come into evidence.  *Wright v. State*, 285 Ga. 428, 431-432 (2) (677 SE2d 82) (2009).  And, following a *Jackson v. Denno* proceeding, this Court will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous.  Id. at 432 (2).  There is no such error in this case.

> [A] defendant's alleged cognitive impairment is not dispositive on the question of voluntariness but is one factor for the trial court to consider in the context of the totality of the circumstances surrounding a statement and a waiver of *Miranda* rights. [Cit.] The mere showing that a defendant who has confessed to a crime may have some mental disability is an insufficient basis upon which to exclude the defendant's statement. [Cit.] Indeed, the fact that a defendant is of below average intelligence or even has moderate mental retardation does not, in and of itself, warrant the exclusion of the defendant's inculpatory statement; there must be additional and sufficient evidence that the defendant did not have the capacity to understand and knowingly waive his *Miranda* rights. [Cit.]And, whether a defendant lacks the capacity to understand and waive such rights due to a mental deficiency or illiteracy is a question of fact for the trial court to determine. [Cit.]

*Barrett v. State*, 289 Ga. 197, 199 (1) (709 SE2d 816) (2011) (internal citations

omitted).

Even though Colton's academic records may have reflected a less-than-average intellectual range, they by no means established that Colton was incapable of understanding and knowingly waiving his *Miranda* rights. Nor did Colton present any expert testimony at the *Jackson v. Denno* hearing that demonstrated such incapacity. See *Flowers v. State*, 265 Ga. 688, 689 (2) (461 SE2d 533) (1995) (even a defendant's offer of expert testimony that his mental age was that of an eight-year-old and prevented him from making a valid waiver of his *Miranda* rights, without more, was insufficient). Indeed, the statements by the educational consultant, who had never met Colton and who was testifying as merely the records custodian, regarding Colton's understanding of language and concepts, was merely speculative. And, the testimony of Colton's own mother was that "everyday interaction" with Colton was "normal" and that he was capable of expressing any lack of understanding. There was no other evidence offered by Colton to negate the positive showing by the State that Colton was not impaired by internal or external factors so as to be unable to understand his rights, knowingly waive them, and voluntarily make his

inculpatory statement about the fatal encounter.[5]

Simply, when the evidence regarding the voluntariness of Colton's confession is considered in its entirety, the trial court's finding that the confession was admissible can not be found to be clearly erroneous. Id.

*E. Bussie's Statement to Police on November 28, 2002*

The gravamen of what Bussie told police shortly after the murder was that Colton and Blount got into a fight; that he saw Colton kicking Blount in the head and chest while Blount was lying on the ground; that he tried to break up the fight and stop Colton from kicking Blount; and that he did not know how the chair from the trunk of the car ended up on the ground outside the vehicle.

2. As this Court noted in Colton's prior appeal, any error in admitting evidence of the aforementioned non-custodial statement by Bussie may be found to be harmless in light of other properly admitted evidence at trial. *Colton v.*

---

[5]The dissent relies principally upon the trial testimony of a child psychologist which testimony obviously was not a part of the *Jackson v. Denno* hearing, the evidentiary proceeding that is the legal vehicle for a trial court's initial determination of the voluntariness of a defendant's statement and which was the basis of the trial court's ruling in this case. Even assuming that the psychologist's testimony is properly considered, the dissent acknowledges that the psychologist determined that Colton had only a "mild intellectual disability." But, even more significantly, the jury heard the testimony and soundly rejected the premise that Colton was unable to understand his rights and knowingly waive them when it returned a verdict including the express finding that Colton's confession was voluntary.

*State*, supra at 512 (2). And, indeed, Bussie's statement was merely cumulative of Colton's own inculpatory statement to police and the other properly admitted evidence of Colton's guilt; therefore, the error in the admission of Bussie's non-custodial statement to police was harmless. *Jackson v. State*, 291 Ga. 22, 24 (2) (727 SE2d 106) (2012).

Judgments affirmed. All the Justices concur, except Benham and Hunstein, J J., who dissent.

S14A0703.  COLTON v. THE STATE.

HUNSTEIN, Justice, dissenting.

When Colton's statement is examined under the totality of the circumstances, as we are required to do, see Johnson v. State, 295 Ga. 421 (2) (761 SE2d 13) (2014), I reach the inescapable conclusion that Colton did not make his statement voluntarily.  Therefore, I must dissent.

A mere 30 hours before he gave his statement to police, Colton had been in a car wreck; was too intoxicated to communicate with medical personnel; was combative, aggressive, and in intense pain; and was placed in an ICU unit. Upon his release from the hospital, he was immediately transported to the sheriff's office for interrogation.  At the time he gave his statement, the 17-year-old juvenile's hands and face were still swollen and injured, and he appeared puzzled and did not know why he was brought to jail.  An expert child psychologist, who had tested Colton a few years before the incident and reviewed his most recent records, testified at trial[1] that Colton suffers from a

---

[1]In determining the admissibility of a confession, we may look to all of the evidence in the record.  Haynes v. State, 269 Ga. 181 (4) (496 SE2d 721) (1998).

mild intellectual disability. She noted that, as of one year prior to the incident, he had an I.Q. of 62 and read at a third-grade level, meaning that he would not be able to read food labels or comic books and would not easily understand words such as "yesterday" or "sentence." In her expert opinion, Colton would have had difficulty understanding many of the words in the Miranda waiver form, such as "statement," "officer," "initial," "form"; would not have understood the concept that he had the right to remain silent; and would have been less likely to ask for help. Finally, she opined that a person with Colton's mental capacity, particularly coupled with his injuries, would be less likely to understand his rights. When viewed in its entire context, Colton's statement was not made knowingly and voluntarily.

Even if his co-defendant's statement was admitted, there is no doubt in my mind that Colton's statement influenced the jury's verdict and contributed to his conviction, making it a harmful error. See Yancey v. State, 275 Ga. 550, 557 (3) (570 SE2d 269) (2002) ("Whether a constitutional violation constitutes harmless error depends on whether the state can prove beyond a reasonable doubt that the error did not contribute to the verdict."). Accordingly, I would reverse.

I am authorized to state that Justice Benham concurs in this dissent.

2