320 Ga. 536
FINAL COPY

S24A1032. THE STATE v. TRIPP.
S24X1033. TRIPP v. THE STATE.

L<small>A</small>G<small>RUA</small>, Justice.

On May 23, 2017, Leon Lamar Tripp was arrested on charges related to the disappearance of Latania Janell Carwell, the 16-year-old daughter of Tripp's wife, Tanya Faye Tripp. Following the discovery of Janell's remains on March 8, 2018, Tripp was indicted by a Richmond County grand jury for murder, kidnapping, and other crimes related to Janell's death.[1] After Tripp's arrest, he was interviewed by law enforcement officers on multiple occasions. Tripp later moved to suppress those custodial statements. Following a suppression hearing, the trial court granted in part and denied in part Tripp's motions to suppress. The State timely appealed, and Tripp filed a timely cross-appeal. For the reasons that follow, we

---

[1] Tanya was also indicted for murder and other crimes related to the death of Janell. The State initially sought the death penalty in this case, but in November 2023, the State reindicted Tripp and Tanya and did not seek the imposition of the death penalty.

affirm in part and reverse in part the trial court's rulings as to the admissibility of Tripp's custodial interviews.

1. Based on evidence presented at the suppression hearing and the express findings in the trial court's order on the motions to suppress, the pertinent facts of this case are as follows. In mid-April 2017, Tanya contacted the Richmond County Sheriff's Office ("RCSO") and reported that Janell was missing, having last been seen leaving the family residence in Augusta with Tripp a few days earlier. Because Janell was reportedly in the presence of Tripp and Tanya before her disappearance, the RCSO focused their investigation on the Tripps. Tanya told the RCSO that she did not know Tripp's current whereabouts, and she had not been in contact with him since he left Augusta with Janell. The RCSO was unable to locate Tripp for several weeks; however, with the assistance of other law enforcement agencies, the RCSO tracked Tripp to the Atlanta area. On May 23, 2017, Tripp and Tanya were located together at a U-Haul store in DeKalb County, and Tripp was arrested and taken into custody by the DeKalb County Sheriff's

2

Office. At the time of Tripp's arrest, he was charged with crimes related to Janell's disappearance. However, on March 8, 2018, Janell's remains were located in a shallow grave in Richmond County, and additional charges were brought against Tripp, including murder.

Following Tripp's arrest and during the subsequent investigation, Tripp was interviewed by law enforcement officers on May 23, 2017, June 2, 2017, June 7, 2017, June 9, 2017, June 26, 2017, March 12, 2018, and March 14, 2018. In August 2022, Tripp filed separate motions seeking to suppress each of these custodial interviews. The trial court heard the motions on November 21, 2022. On March 21, 2024, the trial court issued an order denying Tripp's motions to suppress his custodial interviews between May 23, 2017, and June 7, 2017, but granting his motions with respect to his custodial interviews that occurred after June 8, 2017. Following the issuance of the trial court's order, the State stipulated that it did not intend to introduce or use any of the interviews conducted on June 7, 2017, June 26, 2017, March 12, 2018, and March 14, 2018.

Accordingly, the May 23, 2017, June 2, 2017, and June 9, 2017 interviews are the only custodial interviews at issue in this appeal.

(a)  *May 23, 2017 custodial interview*

After Tripp was arrested on May 23, RCSO Investigators Ronald Sylvester and William Smith traveled to the DeKalb County Jail to interview Tripp. The prosecutor tendered the audio recording of the May 23 interview into evidence at the hearing on the motions to suppress and played the audio recording for the trial court. As demonstrated by the audio recording, the testimony, and the documentary evidence presented at the hearing, at the outset of the May 23 interview, the investigators advised Tripp of his *Miranda*[2] rights and presented Tripp with a "Miranda Warning and Waiver of Counsel" form used by the RCSO, which they read verbatim to Tripp while he followed along. As the officers read the *Miranda* waiver form to Tripp, he initialed the form beside each of the following delineated *Miranda* rights:

(1)  "That I have the right to remain silent";

---

[2] See *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

4

(2) "Anything I say can and will be used against me in a court of law";

(3) "I have the right to talk to an attorney and have him present with me while I am being questioned or before making any statements";

(4) "If I cannot afford an attorney, one will be appointed to me by the Court, free of charge, to represent me; and to have him present before making any statements or before any questioning";

(5) "[I]f I request an attorney, no questions will be asked until an attorney is present to represent me"; and

(6) "I can decide at any time to exercise these rights and not answer any questions or make any statements."

Tripp then signed the *Miranda* waiver form, affirming that he "read this statement of [his] rights," "underst[oo]d what [his] rights [we]re," and "made this decision freely and voluntarily" without any "promises or threats hav[ing] been made to induce [him] to sign this waiver of counsel." After Tripp signed the *Miranda* waiver form, Investigator Sylvester asked Tripp if he understood "everything that was read to him as far as his rights [we]re concerned," and Tripp said, "Yes." The officers then signed the *Miranda* waiver form and assisted Tripp in completing a pre-interview worksheet, which included Tripp's personal information, such as name, date of birth, motor vehicle information, and residential address.

At this point in the interview, Investigator Sylvester said to Tripp, "You know why we're here," and Tripp responded, "Yes." Investigator Sylvester explained that they wanted to find Janell and "make sure she's OK." Investigator Sylvester then advised Tripp that he had "read [Tripp his] *Miranda* [rights]" and asked if Tripp wanted to talk to them. Tripp responded that he would tell the investigators "all that [he] kn[e]w." Thereafter, Tripp stated that, on the night of Sunday, March 16, Janell rode with Tripp from their house in Augusta to a neighboring town to fix a friend's car, and then, Tripp and Janell traveled to Atlanta to stay at a house belonging to Tripp's cousin. Tripp said it was Janell's sixteenth birthday, and she wanted to go shopping in Atlanta. According to Tripp, after he and Janell had been in Atlanta for about two or three days, he gave her $400 to go shopping, and she told him that, afterward, she was going to "catch the bus" to go "back home." Tripp said that, when he got back to his cousin's house from work that day,[3] Janell was gone, so he assumed she took the bus home. Tripp

_____

[3] Tripp told the investigators that he worked miscellaneous construction

6

said he did not see or speak to Janell again after that morning, and he worked in Atlanta for the rest of the week. According to Tripp, when he got back to his Augusta home that weekend, Tanya asked him where Janell was, and Tripp said he "had no idea." Tripp stated that he did not realize Janell never came home, and Tanya advised him that the police were looking for him and Janell.

After talking to the investigators for about an hour, Tripp said, "I'm through with this interview. . . . I've told y'all what I knew. . . . I don't know where my daughter at. . . . I hope y'all find her." The investigators then terminated the interview. Following this interview, Tripp was transported to the Richmond County Detention Center.

(b)  *June 2, 2017 custodial interview*

After Tripp was transferred to the Richmond County Detention Center, he was brought to the RCSO for another interview on June 2. The prosecutor tendered the video recording of the June 2 interview into evidence at the hearing on the motions to suppress

---

or handyman jobs while he was in Atlanta.

and played the video recording for the trial court. As demonstrated by the video recording, the testimony, and the documentary evidence presented at the hearing, Investigator Sylvester and Investigator Mark Dobbins conducted the June 2 interview of Tripp. At the beginning of the interview, Investigator Sylvester told Tripp there had been "some developments in the case" since they last talked on May 23, and they wanted to speak to Tripp to "get some clarification" on those issues. Tripp responded, "Okay." Investigator Sylvester informed Tripp that Tanya had also been arrested and that the investigators needed to know "the full extent" of her involvement in Janell's disappearance.

Investigator Sylvester then advised Tripp that, because he was in custody and they were talking to him again, they were required to "go over his *Miranda* [rights]" again. Investigator Sylvester then handed Tripp the same *Miranda* waiver form they reviewed with him during the May 23 interview and asked him to put his name at the top of the form. Tripp would not do so. Investigator Dobbins explained that, in order for them to discuss additional information

8

with Tripp, "by law, [they] ha[d] to read [him] [his] *Miranda* warning." Tripp asked why he had to sign one of the *Miranda* waiver forms twice, stating he already told them "what's going on." The investigators advised Tripp it was a "procedural thing" they were "required to do." Investigator Sylvester then asked Tripp to put his name at the top of the *Miranda* waiver form, and Tripp shook his head and mumbled a negative response. The investigators said, "Okay."

At that point, Investigator Sylvester read the *Miranda* waiver form to Tripp and asked if he understood his *Miranda* rights. Tripp nodded affirmatively and again initialed the form beside each of his *Miranda* rights as follows:

(1) "That I have the right to remain silent";
(2) "Anything I say can and will be used against me in a court of law";
(3) "I have the right to talk to an attorney and have him present with me while I am being questioned or before making any statements";
(4) "If I cannot afford an attorney, one will be appointed to me by the Court, free of charge, to represent me; and to have him present before making any statements or before any questioning";
(5) "[I]f I request an attorney, no questions will be asked until

9

an attorney is present to represent me"; and

(6)   "I can decide at any time to exercise these rights and not answer any questions or make any statements."

Investigator Sylvester asked Tripp to sign the bottom of the *Miranda* waiver form. Tripp put the pen down and crossed his arms, refusing to sign. Investigator Dobbins asked Tripp, "Do you understand your rights?" Tripp said, "Yep." Investigator Dobbins asked, "As they were read?" and Tripp said, "Yes. I understand." Investigator Dobbins asked Tripp if he was under the influence of any drugs or alcohol, had any mental disorders, or had been promised anything or threatened in any way, and Tripp denied each of these inquiries.

The investigators then proceeded with the interview, and Tripp indicated that, while he wanted to hear any new information the investigators had to share with him, he did not want to go over matters they had already discussed during the May 23 interview. After a few hours of questioning, Tripp told the investigators to "do whatever they [were] going to do [to him]" and "charge [him] with whatever they were going to charge [him] with" because he was

10

"tired of being asked about this s**t" and "[did]n't know nothing else." The interview concluded at that point.

(c) *June 9 custodial interview*

On June 9, Tripp was transported from the jail to the RCSO for another interview. Defense counsel tendered the video recording of the June 9 interview into evidence at the hearing on the motions to suppress and played the video recording for the trial court. As demonstrated by the video recording, the testimony, and the documentary evidence presented at the hearing, the June 9 interview began at 1:46 p.m. when Investigator Grant entered the interview room with Tripp and went over Tripp's *Miranda* rights, utilizing the same *Miranda* waiver form Investigator Sylvester previously reviewed with Tripp during the May 23 and June 2 interviews.

Investigator Grant went through each of Tripp's *Miranda* rights as follows:

> INVESTIGATOR GRANT: All right. I'm going to read this to you. "I, Leon Tripp, have been informed by the undersigned law enforcement officers, prior to being

11

questioned by them." Number one. "That I have the right to remain silent." You understand that right?

TRIPP: Um-hum (affirmative).

INVESTIGATOR GRANT: Number two. "Anything I say can and will be used against me in a court of law." You understand that right?

TRIPP: Right.

INVESTIGATOR GRANT: Number three. "I have the right to talk to an attorney and have him present with me while I am being questioned or before making any statements." You understand that?

TRIPP: Yeah.

INVESTIGATOR GRANT: Number four. "If I cannot afford an attorney, one will be appointed to me by the Court, free of charge, to represent me; and to have him present before making any statements or before any questioning." You understand that?

TRIPP: Right.

INVESTIGATOR GRANT: Number [five]. "That if I request an attorney, no questions will be asked until an attorney is present to represent me." Do you understand that?

TRIPP: Yeah.

INVESTIGATOR GRANT: Number six. "I can decide at any time to exercise these rights and not answer any questions or make any statements." Do you understand that?

TRIPP: Right.

INVESTIGATOR GRANT: I'm going to read this last statement out loud for you. "I have read this statement of my rights, and I understand what my rights are. I have made this decision freely and voluntarily and no promises or threats have been made to induce me to sign this waiver of counsel." If you'll just initial these six and then sign right there for me. (Gesturing to the bottom of form.)

Tripp started initialing the *Miranda* waiver form, but then stopped, stating:

> TRIPP: I'm kind of skeptical about doing this because I talked to my lawyer, and he was like, you know what I'm saying. (Pause.) I may need him to be here, man, because he was like don't say nothing else to nobody unless he's here, unless he's present.

Investigator Grant asked Tripp, "Who is your attorney?" Tripp responded, "Peter something. He's with the Public Defender's Office." After describing what his attorney looked like, Tripp told Investigator Grant, "He told me don't talk to nobody else about nothing unless he's present." Investigator Grant indicated that he would call Tripp's attorney, and Tripp said, "Yeah. He just talked to me yesterday." Investigator Grant said, "Okay," and left the interview room at 1:50 p.m.

At the suppression hearing, Investigator Grant testified that he believed Tripp had invoked his right to counsel, so he left the interview room to call Natalie Paine, the District Attorney at the time, to ask her to contact Tripp's attorney about coming to the

13

Sheriff's Office to meet with Tripp. Investigator Grant testified that he called Paine because he did not have contact information for Tripp's attorney. Paine testified that she remembered calling attorney Peter Johnson on June 9 and meeting him at the Sheriff's Office later that day, but she did not recall the content of their conversation.

According to Johnson's testimony at the suppression hearing, he was appointed as counsel for Tripp on June 5, 2017, and he confirmed that he received a call from Paine on June 9. Johnson testified that Paine told him Tripp was "about to be interrogated, interviewed," and she asked if he would "like to come represent him," to which Johnson responded, "I probably should." Johnson testified that he arrived at the Sheriff's Office "within an hour," and when he arrived at the Sheriff's Office, he "encountered" Investigator Grant and Paine, who told him that Tripp "was willing to be interviewed."

At 3:17 p.m., prior to the arrival of Tripp's counsel, Investigator Grant re-entered the interview room, placed a document in front of

14

Tripp, told Tripp he was "going to bring [Tripp's] attorney in here before this starts," motioned to the document in front of Tripp, and indicated that Tripp needed to sign the document.[4] Tripp told Investigator Grant that he "was not going to talk, but [he] would listen to what they had to say." Investigator Grant said he knew that, but Tripp "still ha[d] to sign these." Tripp then appeared to initial and sign the document, and Investigator Grant took the document and stood up to leave the interview room. As Investigator Grant walked toward the doorway, Tripp told Investigator Grant that he was tired, and Investigator Grant offered Tripp "a dip or something." Tripp continued talking, and at that point, the following exchange occurred:

> TRIPP: I mean, I really just, you know what I'm saying, I really just rather get this s**t over with, man, you know what I'm saying. I'm really just tired really, man.
> INVESTIGATOR GRANT: Yeah.
> TRIPP: I mean I want to try to resolve it as best I can. You know what I'm saying, like. But I need to talk to my

---

[4] At the suppression hearing, Investigator Grant testified that the document he gave Tripp was the *Miranda* waiver form they started reviewing earlier in the interview and that he re-entered the interview room solely for the purpose of completing that form. Any *Miranda* waiver form completed on June 9, 2017, has not been made part of the record in this case.

wife first, man. You know what I'm saying.

INVESTIGATOR GRANT: Um-hum (affirmative).

TRIPP: Two things I want. I want to talk to my wife, and I want to see my little two kids and my mama. If y'all can do that for me, man, I'll tell y'all, you know what I mean, I'm go ahead and so y'all can close this case, man, you know what I'm saying. You know 'cause I'm tired, you know what I'm saying. But I want to see my two daughters and my mama, man. I want to see my wife, you hear what I'm saying. And I'll tell y'all, you know what I mean, what's going on, you know, where she at. All that, man. You know 'cause I'm tired, you know what I'm saying. I don't want to talk to them no more, you know. For now, at this point, as a matter of fact, I don't want to talk to nobody but you. When I tell you all this, but like I say, I want to see my two girls, my two daughters, man, my wife, and my mama.

INVESTIGATOR GRANT: Which two daughters? Which two daughters you talking about? You talking about the seven-year-old?

TRIPP: Aniya and my younger one. I want to see my two daughters because I ain't seen them since I been home. And my mom. . . . And my wife man. I'll go ahead and y'all can close this case, man, you know what I'm saying. I'm tired of all this talking. You know, my wife, she ain't done no wrong 'cept being around me, you know I'm saying. I'm tired, you know what I'm saying. See my family, man, we'll close this case, you know what I'm saying.

INVESTIGATOR GRANT: Okay.

During this conversation, Sheriff Richard Roundtree entered the interview room, and Investigator Grant introduced Tripp to Sheriff Roundtree. While Investigator Grant went to get Tripp's

16

attorney, Tripp and Sheriff Roundtree engaged in small talk, with Tripp telling the Sheriff that he had heard people speak "highly" of him and the two discussing what part of town the Sheriff lived in and how long Tripp had lived in Augusta. At 3:21 p.m., attorney Peter Johnson entered the interview room. Sheriff Roundtree asked Johnson if he was representing Tripp, and Johnson confirmed that he was Tripp's attorney. Sheriff Roundtree told Johnson that he "came in on the tail end of [Tripp's] conversation with Investigator Grant" and that Tripp had "indicated he wants to add some resolution to this case."

At 3:23 p.m., the following exchange occurred:

TRIPP: I just told him, man, if I can see my kids, my mama, and my wife, man, I'll resolve it today. That's what I want.

Johnson reminded Tripp that, because Tripp's wife "[was] represented," she could not talk to Tripp.

TRIPP: If she can talk to me, we'll resolve it.
JOHNSON: Really? It's that simple? . . . You have an opportunity to have a conversation with Tanya, and the situation resolved, is that it? That's what I mean when I say, "is it that simple?"

17

TRIPP: I am going to tell them what they need to know to close this case.

JOHNSON: Okay. Does that mean that you do have information that they need to know?

TRIPP: Yeah. I have information, and I want to see my family before I close the case. That's what I just explained to him.

Sheriff Roundtree informed Tripp that the Sheriff would try and arrange for Tripp to see his family and speak to his wife within the "confines of the law," but Sheriff Roundtree wanted to "close [the case] out today." Johnson then advised Tripp that he needed to know whether, if Tripp "had information," how "badly" the information would "hurt" Tripp. At that point, Johnson indicated he wanted to speak to Tripp privately, and Sheriff Roundtree left the interview room. The video recording was redacted between 3:29 p.m. and 3:35 p.m.

At 3:37 p.m., Sheriff Roundtree and Johnson re-entered the interview room, and Johnson advised Tripp that he told the Sheriff, "[O]n advice of counsel, you have nothing more to say." Sheriff Roundtree informed Johnson and Tripp that he had contacted

18

Tripp's family and could arrange to have them there that night, emphasizing that he wanted to resolve the case. Johnson counseled Tripp that he had already given Tripp his advice. Sheriff Roundtree then asked Tripp, "So, you're refusing to make a statement?" Tripp responded, "Yes sir." Sheriff Roundtree and Johnson then exited the interview room, and Johnson left the Sheriff's Office.

Over the next two hours, Investigator Grant and two other investigators periodically entered the interview room for brief intervals and engaged Tripp in conversation.

(d)   *Pretrial hearing on motions to suppress*

As noted above, Tripp filed pretrial motions to suppress the statements he made during each of his custodial interviews. The trial court held a hearing on the motions on November 21, 2022, and on March 21, 2024, the trial court issued a written order granting in part and denying in part Tripp's motions to suppress.[5]

As to the May 23, 2017 and June 2, 2017 interviews, the trial

---

[5] Again, the only custodial interviews at issue here are the May 23, 2017, June 2, 2017, and June 9, 2017 interviews.

court concluded that, based upon the evidence presented, "the statements made by [Tripp] were freely and voluntarily made, without any threat or coercion, and without having been offered the slightest hope of reward or other benefit." The trial court further determined that "the statements on those dates were made after [Tripp] had been read his rights under the progeny of [*Miranda*] and after [Tripp] had waived each of those rights." On this basis, the trial court ruled that the May 23 and June 2 interviews were "admissible in evidence at the trial of this case."

As to the June 9, 2017 interview, the trial court found that, at the beginning of the interview, "[Tripp] was advised of his *Miranda* rights," and "[w]hen asked to acknowledge his rights and to waive them for purposes of an interview, [Tripp] advised that his lawyer had said, 'Don't talk to anybody without me present.'" The trial court then found the following: (1) the "investigators summoned [Tripp's] attorney, who entered the interview room with the Sheriff of Richmond County at 3:20 p.m."; (2) the Sheriff left the interview room, and Tripp and his attorney "conferred" before the Sheriff "was

brought back to the interview room at 3:37 p.m."; and (3) "[d]efense counsel [then] stated to the Sheriff, in the presence of [Tripp]" that, "on the advice of counsel, you have nothing else to say."

Based on these facts, the trial court ruled that "any statements made by [Tripp], after his counsel advised the Sheriff of Richmond County that [Tripp] would not make any additional statements, are not admissible in evidence in the State's case in chief," and "to that extent, [Tripp's] Motion to Suppress statements made by [Tripp] after June 8, 2017 is GRANTED."

On appeal, the State asserts that, after receiving and reviewing the trial court's order on Tripp's motions to suppress on March 21, 2024, the State noted what "appeared to be a contradiction between the trial court's analysis concerning [Tripp's] custodial statement conducted on June 9, 2017 and the trial court's ultimate ruling that [Tripp's] Motions to Suppress after June 8, 2017 were granted." According to the State's appellate brief and as reflected in the record, the prosecuting attorney sent an e-mail to the trial court on March 21, copied to defense counsel, "requesting some clarification about

21

the dates" in the trial court's order. Later that morning, the trial court's staff attorney responded by e-mail to all counsel, advising that "[t]he Court's Order means what it says." The State then moved the trial court for an emergency hearing to address what the State perceived as dates that were "in contradiction to one another" and to seek "clarification of the [trial court's] ultimate ruling" on Tripp's June 9, 2017 custodial interview. The trial court's staff attorney e-mailed counsel on the afternoon of March 21 and advised that "[t]here is no need for a hearing," and the trial court would "see everyone for jury selection on Monday."

Based upon the express language of the trial court's March 21 order and its refusal to revisit that ruling when asked to do so by the State, we conclude that the trial court suppressed Tripp's June 9 custodial interview in its entirety. Compare *Thomas v. State*, 319 Ga. 123, 126 (2) (902 SE2d 566) (2024) (noting that a trial court retains broad discretion to reconsider and modify "interlocutory rulings before entry of final judgment").

2. The State appealed the trial court's March 21 order to this

22

Court under OCGA § 5-7-1 (a) (4), arguing that, if the trial court suppressed the entire June 9 custodial interview, the trial court erred in doing so because the statements Tripp made prior to 3:37 p.m. were voluntary, "unprompted," and "not in response to any police questioning." However, the State "concedes that any statements made by [Tripp] after [3:37 p.m. when] Mr. Johnson informs Sheriff Roundtree that his client will not be making anymore statements to law enforcement are inadmissible in [the State's] Case-In-Chief" and "are not at issue before this Court."

Tripp filed a cross-appeal of the trial court's March 21 order pursuant to OCGA §§ 5-7-1 (b) and 5-6-38, arguing that the trial court erred in the following ways: (1) by ruling that Tripp waived his *Miranda* rights during the May 23 and June 2 custodial interviews; (2) by ruling that Tripp did not invoke his privilege against self-incrimination during the June 2 custodial interview; and (3) assuming the trial court did not suppress the entire June 9 interview, by allowing any portion of the June 9, 2017 custodial interview to be admitted after Tripp invoked his right to counsel. We

conclude that the evidence supports the trial court's conclusions that the May 23 and June 2 interviews are admissible at trial; however, because certain of the statements Tripp made during the June 9 interview should not have been suppressed based on *Miranda*, we conclude the trial court erred in excluding the June 9 interview in its entirety.

> When ruling on a motion to suppress, a trial court decides whether a defendant's statement is admissible based on the preponderance of the evidence considering the totality of the circumstances. The State bears the burden of proof. We have previously explained that when reviewing a trial court's ruling on a suppression issue, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court. In cases where some or all of the material facts are undisputed, we properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact. Finally, we review de novo the application of the facts to the law — that is, the trial court's ultimate conclusion whether, under all the circumstances, the defendant's statement was voluntary.

*State v. Franklin*, 318 Ga. 39, 39 (1) (897 SE2d 432) (2024) (citations and punctuation omitted).

(a) *May 23 and June 2 custodial interviews*

24

(i)    As noted above, Tripp contends on appeal that the trial court erred by concluding that he waived his *Miranda* rights during the May 23 and June 2 custodial interviews, emphasizing that his eighth-grade education level should have put the RCSO investigators "on notice that they [were] not dealing with an intellectually sophisticated individual." We disagree that the trial court erred in this respect.

As established by the United States Supreme Court in *Miranda*, when a defendant is in custody and is subject to interrogation, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U. S. 436, 479 (III) (86 SCt 1602, 16 LE2d 694) (1966). "To use a defendant's custodial statements in its case-in-chief, the State must prove by a preponderance of the evidence that the defendant was advised of these rights and that he voluntarily,

knowingly, and intelligently waived them." *State v. Lopez-Cardona*, 319 Ga. 222, 226 (2) (a) (903 SE2d 18) (2024) (citing *Hinkson v. State*, 310 Ga. 388, 400 (5) (b) (850 SE2d 41) (2020)). See also *Colton v. State*, 296 Ga. 172, 178 (D) (1) (766 SE2d 38) (2014) ("Certainly, only voluntary incriminating statements are admissible against an accused at trial, and it is the State's burden to prove the voluntariness of a [custodial statement] by a preponderance of the evidence.").

"In assessing whether a defendant voluntarily, knowingly, and intelligently waived his rights under *Miranda*, a trial court must consider the totality of the circumstances surrounding the interrogation." *Lopez-Cardona*, 319 Ga. at 227 (2) (a). See also *Hinkson*, 310 Ga. at 400 (5) (b) ("Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.").

[T]he fact that a defendant is of below average

intelligence or even has moderate [intellectual disability] does not, in and of itself, warrant the exclusion of the defendant's inculpatory statement; there must be additional and sufficient evidence that the defendant did not have the capacity to understand and knowingly waive his *Miranda* rights. And, whether a defendant lacks the capacity to understand and waive such rights due to a mental deficiency or illiteracy is a question of fact for the trial court to determine.

*Colton*, 296 Ga. at 178-179 (D) (1) (citation and punctuation omitted).

Though Tripp argues that his eighth-grade education level limited his capacity to voluntarily waive his *Miranda* rights in the May 23 and June 2 custodial interviews, his argument is belied by the record. The record demonstrates that, while RCSO investigators were advising Tripp of his *Miranda* rights during the May 23 and June 2 interviews, Tripp verbally affirmed and initialed the corresponding *Miranda* waiver forms, indicating he understood his rights as explained to him by law enforcement. Additionally, on May 23, Tripp signed the *Miranda* waiver form, which stated that he "read this statement of [his] rights," "underst[oo]d what [his] rights [we]re," and "made this decision freely and voluntarily" without any

27

"promises or threats hav[ing] been made to induce [him] to sign this waiver of counsel." And no other evidence appears in the record to show that Tripp was incapable of knowingly and intelligently waiving his *Miranda* rights based upon his education level. See *Donaldson v. State*, 249 Ga. 186, 189 (5) (289 SE2d 242) (1982) (holding that a showing that a defendant is "illiterate" or lacked a certain level of education "does not, without more, show that he was incapable of understanding his *Miranda* rights when they are read to him").

Thus, having considered the evidence regarding the voluntariness of Tripp's statements during the May 23 and June 2 interviews in its entirety, we conclude that the trial court did not err in its determination that Tripp "voluntarily, knowingly, and intelligently waived his rights under *Miranda*" during these interviews. *Lopez-Cardona*, 319 Ga. at 227 (2) (a).

(ii) Tripp also contends on appeal that the trial court erred by concluding that he did not invoke his privilege against self-incrimination during the June 2 interview because, when the RCSO

investigators asked him to sign and date the *Miranda* waiver form, Tripp shook his head, put the pen on the table, and stated, "No," purportedly "evinc[ing] his desire to invoke his right to remain silent." Tripp further argues that his statement to investigators later in the interview to "do what they're going to do" was a renewal of "his assertion of rights." We disagree that Tripp invoked his Fifth Amendment right against self-incrimination during the June 2 interview.

The United States Supreme Court has held that "an accused who wants to invoke his or her right to remain silent [must] do so unambiguously." *Berghuis v. Thompkins*, 560 U. S. 370, 381 (III) (A) (130 SCt 2250, 176 LE2d 1098) (2010).

> A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that avoids difficulties of proof and provides guidance to officers on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity.

29

> Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in custodial interrogation. But as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.

Id. at 381-382 (III) (A) (citations and punctuation omitted).

Although the record reflects that Tripp would not sign the *Miranda* waiver form during the June 2 interview, he still initialed the form as the investigators read it aloud to him, and when asked whether he understood his *Miranda* rights — despite his ultimate unwillingness to sign the form — Tripp verbally affirmed that he understood his rights as they were read to him and then proceeded to talk with the investigators. See *Berghuis*, 560 U. S. at 375 (I) (A) (concluding that a defendant's voluntary statement was admissible despite his refusal to sign the waiver form delineating his *Miranda* rights). Additionally, while Tripp argues that shaking his head, putting his pen down, and saying "No" when asked to sign the *Miranda* waiver form "evinced his desire to invoke his right to remain silent," those acts did not unambiguously and unequivocally

indicate that Tripp "wanted to remain silent or that he did not want to talk with the police," id. at 382 (III) (A), particularly since — as noted above — he verbally acknowledged that he understood his *Miranda* rights and then voluntarily discussed the case with law enforcement officers.

In the same way, though Tripp argues that, when he told the investigators later in the interview to "do whatever they [were] going to do [him]," he renewed "his assertion of rights," this remark was not a clear and unambiguous invocation of Tripp's right to remain silent; nonetheless, the investigators stopped the interview moments later. See *Cheley v. State*, 299 Ga. 88, 90-91 (2) (786 SE2d 642) (2016) (holding that, "[i]n context, [the appellant]'s statement that he was 'completely finished' was not an unequivocal assertion of his right to remain silent," but was "reasonably" understood "to mean only that he had lost patience with the repeated and continued questions about what he had done before"). Again, "a suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand

31

the statement to be an assertion of the right to remain silent." *Perez v. State*, 283 Ga. 196, 198 (657 SE2d 846) (2008) (citation and punctuation omitted).

Accordingly, because Tripp's actions and statements during the June 2 interview were not an unequivocal invocation of his right to remain silent, the trial court did not err in ruling that Tripp's June 2 custodial interview is admissible at trial.

(b) *June 9 custodial interview*

With respect to the June 9 interview, the parties agree that any statements Tripp made after 3:37 p.m. are inadmissible at trial. However, the parties disagree about the admissibility of Tripp's statements *prior* to 3:37 p.m. The State argues that Tripp's prior statements are admissible at trial, while Tripp argues the contrary, asserting that he invoked his right to counsel at the beginning of the interview when he told Investigator Grant that he "may need" his attorney to be there, and any statements after that point should be excluded.

"When a defendant requests a lawyer, police must immediately

32

cease interrogation, or its functional equivalent, including any words or actions by law enforcement calculated to elicit an incriminating response, until counsel is present." *Taylor v. State*, 303 Ga. 225, 231 (5) (811 SE2d 286) (2018). We have held that, "[a]fter counsel has been called for, custodial interrogation may not be reinitiated, unless either the suspect's counsel is present or the suspect reinitiates discussion on [his] own and freely and voluntarily waives [his] right to counsel." Id. However, "[a] request for a lawyer must be clear and unambiguous; the mere mention of the word attorney or lawyer without more, does not automatically invoke the right to counsel." *Taylor v. State*, 304 Ga. 41, 48 (4) (816 SE2d 17) (2018) (citation and punctuation omitted).

> The suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. We have previously held that statements that "I might need a lawyer" and "I will still talk to my lawyer tomorrow" were not clear and unambiguous requests for counsel.

*Lucas v. State*, 273 Ga. 88, 90 (2) (538 SE2d 44) (2000) (citations and punctuation omitted). See also *Dozier v. State*, 306 Ga. 29, 35 (4) (b)

33

(829 SE2d 131) (2019) (holding that the test is whether "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney").

We need not decide in this case whether Tripp unequivocally invoked his right to counsel at the beginning of the June 9 interview because, even if he did, he then made "spontaneous and unsolicited statement[s]" to Investigator Grant that were not "elicited by questioning" or "any form of custodial interrogation." *Doricien v. State*, 310 Ga. 652, 655 (2) (853 SE2d 120) (2020) (holding that "a spontaneous and unsolicited statement is admissible . . . if it was not elicited by questioning or made in response to any form of custodial interrogation") (citation and punctuation omitted). See also *Taylor*, 303 Ga. at 231 (5) ("[a]fter counsel has been called for, custodial interrogation may not be reinitiated, unless . . . the suspect reinitiates discussion on [his] own").

As detailed above, the record demonstrates that Investigator Grant began the June 9 interview by reviewing Tripp's *Miranda* rights with him, and after Tripp acknowledged his understanding of

34

those rights and was initialing the *Miranda* waiver form, Tripp stopped and told Investigator Grant he "may need [his attorney] to be here" because Tripp's attorney had said, "don't say nothing else to nobody unless he's here, unless he's present." Investigator Grant then left the interview room to contact Tripp's attorney. About an hour and a half later, Investigator Grant returned to the interview room, placed the *Miranda* waiver form in front of Tripp, and asked him to sign it, but did not ask Tripp any questions or discuss any of the details of the case with him. See *Jenkins v. State*, 317 Ga. 585, 594 (2) (b) (894 SE2d 566) (2023) ("*Miranda* warnings must be administered to an accused who is in custody and subject to interrogation or its functional equivalent.") (citation and punctuation omitted); *Russell v. State*, 309 Ga. 772, 777-778 (2) (b) (848 SE2d 404) (2020) (holding that "[t]he law does not require . . . that all communications between the suspect and law enforcement must cease after the suspect invokes his right to counsel," and "police statements and actions normally attendant to . . . custody are not considered the functional equivalent of

interrogation, and thus, they are permitted") (citation and punctuation omitted). After Tripp signed the waiver form and Investigator Grant stood up to leave the interview room, Tripp started talking about how tired he was and then expressed his desire to see his family and resolve the case, telling Investigator Grant:

> I want to talk to my wife, and I want to see my little two kids and my mama. If y'all can do that for me, man, I'll tell y'all, you know what I mean, I'm go ahead and so y'all can close this case, man, you know what I'm saying. You know 'cause I'm tired, you know what I'm saying. But I want to see my two daughters and my mama, man. I want to see my wife, you hear what I'm saying. And I'll tell y'all, you know what I mean, what's going on, you know, where she at. All that, man. You know 'cause I'm tired, you know what I'm saying.

We conclude that these statements were made by Tripp "on his own volition and without any prompting" or questioning by Investigator Grant. *Smith v. State*, 292 Ga. 620, 623 (4) (740 SE2d 158) (2013). And, given these circumstances, we further conclude that Tripp's statements to Investigator Grant during this timeframe should not have been suppressed under *Miranda*. See id.

Additionally, the record reflects that, shortly after Tripp made

36

these statements to Investigator Grant, Sheriff Roundtree and Tripp's attorney, Johnson, joined Tripp in the interview room. Tripp then spoke to Sheriff Roundtree and Johnson for approximately eight minutes, reiterating that, "if I can see my kids, my mama, and my wife, man, I'll resolve it today." Johnson then asked to speak to Tripp privately, at which point Sheriff Roundtree left the interview room. At 3:37 p.m., Johnson and Sheriff Roundtree returned to the interview room, and Johnson advised Tripp that he had told the Sheriff, "[O]n advice of counsel, you have nothing more to say."

We conclude that, when Johnson entered the interview room, Tripp's statements to Johnson and Sheriff Roundtree from that point forward — until Johnson expressed a desire to speak with Tripp privately — should not have been suppressed under *Miranda* because Tripp's counsel was present, and Tripp has not claimed any other violation of his rights with respect to these statements that would warrant suppression. See *Jenkins*, 317 Ga. at 594 (2) (b) (holding that, under *Miranda*, "[o]nce warnings have been given," if the defendant "states that he wants an attorney, the interrogation

37

must cease until an attorney is present") (citation and punctuation omitted). We further conclude — and the State concedes — that any statements Tripp made to law enforcement officers after 3:37 p.m., when Johnson returned to the interview room with the Sheriff and Johnson and Tripp confirmed that he had "nothing more to say," are inadmissible in this case. See *Perez*, 283 Ga. at 197 ("A person being subjected to custodial interrogation may at any time express his or her desire to remain silent and, thereby, end the interrogation.") (citation and punctuation omitted).

Accordingly, as to the June 9 interview, because Tripp chose to make spontaneous statements to law enforcement, because those statements were not elicited by interrogation, and because Tripp's counsel was present during the remainder of the interview until 3:37 p.m. — the point at which the State concedes Tripp's future statements are inadmissible — we conclude that Tripp's statements prior to 3:37 p.m. were not obtained in violation of *Miranda* and should not have been suppressed on that ground. See *Doricien*, 310 Ga. at 655 (2).

*Judgment affirmed in part and reversed in part. All the Justices concur.*

LaGrua, Justice, concurring.

I concur fully in the majority opinion's conclusion that three of Tripp's custodial statements are properly and legally admissible at trial. I write separately to express my grave concern about the actions of law enforcement after 3:37 p.m. during Tripp's custodial interview on June 9, 2017.

Irrespective of what one might think of the origins of *Miranda*,[6] it has been binding precedent for over 60 years, and its tenets have been taught to every law enforcement officer in basic, mandated training ever since. Yet, in this case, after 3:37 p.m. on June 9, 2017 — the point at which the State concedes that Tripp's future statements are inadmissible — an investigator inexplicably and repeatedly re-entered the interview room and engaged Tripp in conversations that were clearly designed to elicit conversation and

---

[6] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

potentially incriminating information. Not only was this conduct inappropriate, but it is also an example of why so many citizens have lost faith in the legal system.

It is the duty of the entire legal system, of which law enforcement is an integral part, to uphold the rule of law. It is my sincere hope that this was a momentary lapse of judgment and not routine practice.

Decided December 20, 2024.

Murder. Richmond Superior Court. Before Judge Craig.

*Jared T. Williams, District Attorney, Joshua B. Smith, Justin M. Mullis, Deshala Dixon, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General*, for the State.

*Nathanial Studelska, Laura M. Cobb, Arnold M. Ragas*, for Tripp.