NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 21, 2026

S25A1487.  BURNS v. THE STATE.

LaGrua, Justice.

Appellant Anthony Alexander Burns challenges his 2024 conviction for felony murder in connection with the death of Howard Winning.[1] Burns argues that the evidence was constitutionally insufficient to support his convictions, that the trial court abused its

---

[1] Winning was killed on August 22, 2022. On November 10, 2022, a Columbia County grand jury indicted Burns for malice murder (Count 1), felony murder predicated on aggravated assault with a deadly weapon (Count 2), and felony murder predicated on aggravated assault (strangulation) (Count 3). At a trial from February 26 to 29, 2024, the jury found Burns guilty of both counts of felony murder and was unable to reach a unanimous verdict on the malice murder count. During the sentencing hearing, the State, consistent with its pretrial notice to seek recidivist punishment, introduced certified copies of Burns's four prior felony convictions. The trial court sentenced Burns to serve life in prison without the possibility of parole on Count 2. Count 3 was vacated by operation of law. A mistrial was declared as to Count 1, which was later placed on the dead docket. See OCGA § 5-6-34(a)(1)(A). Burns filed a timely motion for new trial, which he later amended through new counsel. After an evidentiary hearing on February 10, 2025, the trial court entered an order denying the motion for new trial on February 24, 2025. Burns filed a timely notice of appeal, and the case was docketed in this Court to the August 2025 term and submitted for a decision on the briefs.

discretion by denying his motion for new trial on the "general grounds," that the trial court erred in admitting his custodial statement, and that the trial court abused its discretion in admitting autopsy photographs. For the reasons set forth below, we reject Burns's arguments. Accordingly, we affirm.

The evidence at trial showed that in August 2022, Burns had been living for about a year in a townhome Winning shared with his sister, Janet Winning, in Columbia County. Burns was homeless before meeting Winning, and Winning often let "people in a time of need" stay at his house to help them "get back on their feet." Around 8:40 a.m. on August 22, Winning's sister, Barbara Champlin, was driving to Winning's home and saw Burns walking in the same direction in the rain. Winning had told her the day before that he had taken Burns to "Appling." Champlin stopped and asked Burns where he was going. Burns said he was going to Winning's home, and Champlin asked if Winning knew Burns was on the way. Burns said no. Champlin suggested Burns get in her car, and she would call her brother to let him know she had picked up Burns. Champlin

called Winning, who told her to bring Burns to his home and that he would make Burns something to eat because he "probably hasn't eaten." When they arrived at Winning's home, Champlin and Burns went inside. Winning's sister Janet had left for work early in the morning, and only Winning was at home.

Champlin stayed for a short while, taking care of some paperwork. Champlin then left and drove toward Atlanta for a business errand. As she left Atlanta after completing her errand, she noticed she had a missed call from Winning's cell phone at 1:18 p.m. Once Champlin was on the highway heading home, she returned the call, and Burns answered Winning's phone. Burns refused Champlin's request to give the phone to Winning and told her, "We got into a fight," that Winning "is in the floor," and that Burns had "been trying to wake him up for a while." Champlin hung up, called her husband, and asked him to go to Winning's home. Champlin then called Winning's phone a second time. Burns answered and again refused to give the phone to Winning, saying "please, please, I'm sorry, I'm sorry … I've been trying to wake him up. He won't

3

wake up. And I think he's already dead." Champlin hung up again and called her sister Janet, who worked near the townhome. Champlin relayed her conversation with Burns and asked Janet to get the police and an ambulance and go home.

After speaking with Champlin, Burns walked outside and saw a man, later identified as Glen Hendry, standing by a car in front of the townhome directly across the street. Burns approached Hendry and asked, "Can you please help me? My friend has fallen in the bathroom and he needs help." Hendry followed Burns inside Winning's home and immediately saw blood in the hallway. Hendry continued to follow Burns into a bedroom with a connected bathroom. Hendry saw more blood on the floor and saw Burns standing or kneeling over a body that was on the floor, partially in the bedroom and partially in the bathroom. Hendry told Burns that the police should be called and walked outside.

Upon receiving Champlin's call, Janet immediately drove home, arriving just after Hendry was walking out. Janet went inside, saw blood in the hallway, went into Winning's room, and saw

4

Burns sitting on the floor of the bathroom, next to Winning's body. Janet called 911, and Burns walked out of the townhome and sat on a utility box in the yard of another townhome.

Several law enforcement officers with the Columbia County Sheriff's Department responded to the 911 call. The deputy who first arrived at the scene detained Burns after speaking with Janet. Lieutenant David Heaton arrived shortly thereafter, entered the townhome, and quickly determined that Winning was dead. Investigator Phillip Clark investigated the scene and found no evidence of forced entry or of mutual combat.

Burns was transported to the sheriff's office. After acknowledging that he understood his *Miranda*[2] rights, Burns spoke with Investigator Clark and Investigator Allison Foster. The interview was audio- and video-recorded, and a portion of it was played at trial.

During the interview, Burns asked if he could call his mother,

---

[2] *Miranda v. Arizona*, 384 US 436 (1966). Burns does not contend that his statement was involuntarily or unknowingly given under *Miranda*.

the investigators agreed, Investigator Clark used his own cell phone to call Burns's mother, and Burns's and his mother's conversation over speaker phone was recorded as part of the interview. While speaking with the investigators directly and with his mother over the speaker phone, Burns made numerous admissions detailing his assault on Winning. Burns said that he got angry and hit Winning because Winning refused to give him a cigar, saying "I ain't know [Winning] was gonna act like that. Thought he was gonna have a cigar still right there.… Every time I move, he grabbed the s**t I have and move the s**t. I don't like that, I ain't never liked that. So that was automatic—automatically I was like …, a bad place for me to be in right there." When asked by his mother why Burns killed Winning, Burns said "[b]ecause he keep telling me I ain't got no f**king cigars then talking about let's go somewhere. "I told him the cigars was there and I wasn't going." Burns said he "hit [Winning] too many times" and "hurt [Winning] bad," and admitted it was not an accident. Burns also told the officers, "I was there … I hit the man …. There was blood everywhere." Burns also said Winning was

6

his friend, he tried to get help, and he tried to revive Winning.

The medical examiner testified that Winning had a depressed skull fracture, a fractured hyoid bone, and bruises in the neck area, which were consistent with "fingerprint type bruises."[3] The cause of death was strangulation and blunt force trauma to the head, with either injury being sufficient alone to be fatal.

Against his counsel's "strong, strong advice," Burns testified.[4] Burns told the jury that Champlin, Winning's sister, forced him at gunpoint to go to Winning's home the morning of the incident, and that, while he was fighting with Winning, Burns called Janet, Winning's other sister, who told him to kill Winning. He said that Winning "had a leaf in his throat"; "that he was choking"; that Burns tried to remove it, which "didn't take over two minutes"; that Burns

---

[3] As the medical examiner was authenticating a photograph of Winning as he appeared when his body was first received by the medical examiner's office, Burns shouted out numerous times, "That's not how I left the body." The jury was removed, and after a lengthy colloquy with the trial court, Burns agreed to stay in the courtroom without further outbursts.

[4] Prior to trial, the trial court ordered a mental evaluation regarding Burns's competency to stand trial and level of criminal responsibility. Burns was found competent to stand trial, but he "declined to participate" in an evaluation of criminal responsibility.

did "just like [Winning] told me to do him"; and that Winning said, "put me in the bathroom just like this." Burns testified that Winning was not dead, although "[i]t look like it killed him," and that Winning grabbed a knife and cut himself, although the cut was not visible because Winning "knew how to get rid of marks." Burns admitted that he hit Winning but said "[i]t wasn't even 12 times I guarantee you." He also claimed that the fingerprint marks around Winning's throat, which the medical examiner had described, were inflicted by Winning himself. Burns told the jury that he "want[s] the public to know that this is not [Winning's] first time being in an altercation with somebody, and he claim hisself to be dead."

1. Burns enumerates as error that the evidence presented at trial was constitutionally insufficient under *Jackson v. Virginia*, 443 US 307, 319 (1979). However, he makes no substantive argument applying that standard, which requires us to review the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Sims*

*v. State*, 321 Ga. 627, 631 (2025). Instead, the only arguments Burns makes under this enumeration are that, without his custodial statement, the State's case was "wholly circumstantial" and did not exclude the reasonable hypothesis of innocence and that the "absence of forensic linkage further supports reversal." This claim fails.

As an initial matter, whether Burns's custodial statement should have been excluded is irrelevant to a constitutional sufficiency analysis. See *Sims*, 321 Ga. at 631. Rather, when we analyze the sufficiency of the evidence, "we consider all of the evidence presented at trial, without regard to whether some of that evidence might have been improperly admitted." Id. Additionally, contrary to Burns's argument, "circumstantial evidence alone can be constitutionally sufficient." *Hooks v. State*, 318 Ga. 850, 852 (2024) (cleaned up). Moreover, Burns's testimony itself constituted direct evidence of his guilt, see *Mack v. State*, 322 Ga. 390, 393 (2025), so his claim that the evidence presented was wholly circumstantial is

incorrect and provides no support for this enumeration of error.[5]

Finally, there is no merit to his bare assertion that the evidence was insufficient because there "was no forensic linkage." "The fact that the State did not produce certain types of evidence does not mean that the evidence was insufficient.… There is no requirement that it prove its case with any particular sort of evidence." *Jones v. State*, 319 Ga. 758, 761–62 (2024) (cleaned up). Thus, the arguments Burns makes in challenging the constitutional sufficiency of the evidence are without merit. See *Hooks* 318 Ga. at 852; *Sims*, 321 Ga. at 631. And, having reviewed the record under the applicable legal standard, we conclude that the evidence recited above was sufficient as a matter of constitutional due process for a rational trier of fact to find Burns guilty of felony murder predicated on aggravated assault. See *Jones v. State*, 311 Ga. 455, 456–59 (2021) (determining

---

[5] Burns does not cite OCGA § 24-14-6, which provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." To the extent Burns contends that the evidence was insufficient under this statute, his argument is without merit because the statute does not apply when, as here, there is direct evidence of the defendant's guilt. See *Mack*, 322 Ga. at 393–94.

that evidence was constitutionally sufficient to support appellant's conviction for felony murder in the beating death of his girlfriend, where appellant called 911 claiming that his girlfriend was vomiting blood; where appellant told responding paramedics that his girlfriend, who was unresponsive, had fallen in the bathtub; where the victim had bruises, swelling, and dried blood around her face and head; and where the cause of death was blunt force trauma). See also *Downer v. State*, 314 Ga. 617, 622 n.8 (2022) (determining that evidence, which included appellant's inculpatory admissions, was constitutionally sufficient).

2. Burns also contends that the evidence was contrary to the principles of justice and equity and was strongly against the weight of the evidence, and thus the trial court erred in denying his motion for new trial under OCGA §§ 5-5-20 and 5-5-21. Such a claim, commonly called "the general grounds," presents nothing for this Court's review because we do not review the merits of a trial court's

ruling under these statutes.[6] See *Kimbro v. State*, 317 Ga. 442, 446 (2023); *Doricien v. State*, 310 Ga. 652, 653 n.2 (2020).

3. Burns next contends that the officers continued to question him after he invoked his right to counsel under the United States Constitution and that the trial court thus erred by admitting his custodial statement. Burns points to three references to a lawyer that he made during the custodial interview, contending that each reference was an unambiguous request for counsel. As explained below, this claim fails because the first two references were not unambiguous requests for counsel, and while the final reference was an unambiguous request for counsel, the officers ceased their interrogation at that point, but Burns continued to talk at length, thus reinitiating the conversation and implicitly making a knowing, voluntary, and intelligent waiver of his right to counsel.

(a) The record shows the following: Burns's first reference to a

---

[6] Burns does not assert that the trial court failed to exercise the broad discretion granted it under OCGA §§ 5-5-20 and 5-5-21. Nevertheless, the record shows that the trial court recited the applicable standard of review and exercised the discretion granted under these statutes. See *Kimbro v. State*, 317 Ga. 442, 446 n.7 (2023).

12

lawyer occurred right after Investigator Clark read Burns his

*Miranda* rights, when the following exchange occurred:

> INVESTIGATOR CLARK: You can exercise these rights at any time during questioning. You understand that, Tony?

> BURNS: Yes, sir.

> INVESTIGATOR CLARK: I gotcha. All right. Well, I'm just going to start off with some easy, basic stuff real quick.

> BURNS: Can I just get a lawyer or somebody like, I mean like [inaudible] I want to at least want to talk to family.

> INVESTIGATOR CLARK: You want to talk to your family?

> BURNS: Somebody, tell me what I need to do, cause I been asking for help man. Man ain't trying to help me, I don't know why need [sic] help when you can just, I keep telling you man, come on man what's going on, you know?

> INVESTIGATOR CLARK: I don't know who you're talking about.

> BURNS: You can't possibly [inaudible] what I'm talking about. I know somebody been did some calls about this s**t. Cause man I been running for all my whole life, and I ain't been no farther than south Sand Bar Ferry.

Burns continued to "ramble," as Investigator Clark characterized

Burns's manner of speaking. Burns mentioned his parents, the difficult circumstances of his home life growing up, and at one point, said he would rather go to prison than to "Georgia Regional," where he would "stay in there forever. Till somebody shoot me with the Thorazine."

Burns continued to talk about his circumstances growing up, until the following exchange then occurred:

> INVESTIGATOR FOSTER: Sounds like you've been through a whole lot.
>
> BURNS: What you want me to do? I mean I just don't understand it, I just—[inaudible]—I ain't gone—I ain't fixing to say nothing else to incriminate myself man. I mean it ain't like I can tell you nothing you don't already know so I ain't gonna say nothing no more.[7] I'll just wait on a lawyer or something or whatever. I really ain't got nothing to talk about man. Everybody already know. I promise you, everybody already know. When you supposed to be in bed at night time, three, four o'clock in the morning, sometimes 11 or 12 o'clock, oh the police cut the blue lights on. I guess they want you to throw the weed out the window or something, and ride right past us. So they know it was us, you know what I'm saying.
>
> INVESTIGATOR FOSTER: Uh-huh.

---

7 Burns does not contend on appeal that he ever invoked his right to remain silent under either the United States or Georgia constitutions—only that he invoked his federal right to counsel.

INVESTIGATOR CLARK: All right.

BURNS: And that was me and [Winning] every night or something. Going to Jules house right there every night, you know. He can't go there to get cigars but send me in there to get them.

Burns continued to talk about Winning not going into certain stores, groceries that Burns bought, and difficult times Burns experienced in elementary school. After about five minutes, Investigator Clark asked, "So do you want to tell us what happened today, so we'll understand what's going on?" Burns then began to talk about that day, admitting that he had been fighting with Winning, had "hit [Winning] "too many times," and had tried to revive Winning. Then the following exchange occurred:

INVESTIGATOR CLARK: You said you punched him but you didn't kill him, he was still breathing.

BURNS: I ain't gonna say nothing else. Just get me a lawyer man. Please. I ain't gonna say nothing else. I ain't trying to be no a**hole.

INVESTIGATOR CLARK: No, you fine. You don't seem like no a**hole but since you want a lawyer I can't talk no more.

The investigators then got up to leave the room. But Burns continued to speak, expressing frustration with the investigators for getting up to leave the room. Burns then kicked a trash can, and the following exchange occurred:

> BURNS: … I mean, now you done did something, you wanna tell somebody about it. You wanna tell what the f**k is going on and they won't listen or they don't know. I'm through man.
>
> INVESTIGATOR CLARK: I tell you what. I wanna listen. I ain't gonna ask you anything. I'm just gonna listen to you about what you—

Burns began, "That was my friend man," and continued to talk for over an hour, often making statements that had no relation to Winning, including statements about how he was raised and his relationships with family members. The investigators made brief responses, such as "yep," "that's right," and "I gotcha," and confirmed that Winning was dead when Burns asked. But our review of the video shows that the investigators did not ask Burns questions about Winning's death and reiterated that they could not "ask [Burns] any questions" or "try to find out anything."

Nevertheless, Burns continued to talk at length, making the inculpatory admissions set forth above and also talking about various topics in a disjointed and excited manner. After about an hour, the investigators left the room, suggesting that Burns "drink [his] water for a minute."

When the investigators returned about five minutes later, they asked Burns to let them take photographs of him to document any injuries he had, and he denied having any injuries. While Burns was being photographed, he said "I'm trying to figure out what you trying to figure out, I was there." Burns continued to make inculpatory admissions along with additional disjointed comments. Eventually, the officers said they were going to "wrap this up so we don't stress you out no more," and exited the room with Burns.

(b) In its written order, the trial court determined, under the totality of the circumstances, that Burns was aware of his rights under *Miranda*; that Burns "reinitiated conversation with the officers" and "insiste[d] on continuing to talk to the officers"; that after Burns invoked his right to counsel, the officers "ceased all

17

questioning" and thus honored Burns's request; and that Burns's statement "was not the product of any coercive police activity or attempts by law enforcement officers to circumvent [Burns's] rights under *Miranda*."

We begin our analysis by noting that Burns's custodial interview was audio- and video-recorded, and the recording that was played at trial is part of the appellate record. Additionally, the trial court made no credibility findings, and the parties do not point to any evidence beyond the recorded statement in their arguments. Thus, because the controlling facts are ascertainable from the video, are undisputed, and present no questions of credibility, we review the trial court's ruling de novo. See *State v. Franklin*, 318 Ga. 39, 39 & 39 n.1 (2024); *State v. Pauldo*, 309 Ga. 130, 131 (2020).

"When a defendant requests a lawyer, police must immediately cease interrogation, or its functional equivalent, including any words or actions by law enforcement calculated to elicit an incriminating response," unless "either the suspect's counsel is present or the suspect reinitiates discussion on his own and freely

and voluntarily waives his right to counsel." (cleaned up). *State v. Tripp*, 320 Ga. 536, 551 (2024) (quotation marks omitted). If the police continue to interview a suspect who has made a clear and unequivocal request for counsel, "any resulting statements made by the suspect are inadmissible in the State's case-in-chief." *Taylor v. State*, 312 Ga. 1, 9 (2021) (quotation marks omitted). See also *Edwards v. Arizona*, 451 US 477, 484–85 (1981) (holding that once an accused has invoked his right to counsel, the police may not subject him to further interrogation until counsel has been made available to him, "unless the accused himself initiates further communication, exchanges, or conversations with the police").

However, a suspect's request for a lawyer must be "clear and unambiguous" such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. at 551–52. Simply saying the words 'attorney' or 'lawyer,' without more, does not constitute an unambiguous invocation of the right to counsel. Id. And, contrary to Burns's argument," a law enforcement officer is "not always required to

clarify" an ambiguous reference to an attorney. *Lee v. State*, 306 Ga. 663, 668 (2019). "If the defendant makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, cessation of the questioning is not required." *Taylor*, 312 Ga. at 10 (quotation marks omitted).

What an officer is required to do—once a suspect makes a clear and unequivocal request for a lawyer—is to cease *"interrogation,"* that is, "express questioning" or "its functional equivalent," meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response," *Pauldo*, 309 Ga. at 133–34, "unless either the suspect's counsel is present or the suspect reinitiates on his own and freely and voluntarily waives his right to counsel," *Tripp*, 320 Ga. at 551. However, an officer is not necessarily required to leave the suspect's presence or cease all interactions with him following an invocation of the right to counsel. See id. at 134–35. In evaluating whether a defendant's statement—

made after a clear request for a lawyer—is admissible, "the law requires analysis of whether … the police subjected the defendant to further interrogation, and, if so, whether the additional questioning was initiated by the defendant rather than the police." *State v. Brown*, 287 Ga. 473, 476 (2010). Once it is determined that a suspect reinitiated communication with officers, a court "then must determine under the totality of the circumstances whether the suspect voluntarily, knowingly, and intelligently waived his rights under *Miranda*." *Pauldo*, 309 Ga. at 136. In conducting this analysis, we apply an objective standard and focus primarily on the perceptions of the suspect, not the intent of the officer. *Pauldo*, 309 Ga. at 134.

(c) Here, Burns points to his first mention of a lawyer—"can I just wait on a lawyer or somebody, like I mean like … I want to at least talk to family"—and asserts that the officers should have clarified his wishes at this point. Burns thus acknowledges that this reference was not an unambiguous request for counsel, and we agree that this statement would not have been understood by a reasonable

21

officer as an unambiguous request to have counsel present. Instead, this statement, coming right after the recitation of his *Miranda* rights, could have been understood as an attempt to clarify those rights, as a desire to talk to a family member or someone else, or as a statement about potentially wanting a lawyer. Accordingly, the statement was, at best, an ambiguous request for counsel. See *Taylor*, 312 Ga. at 10 (holding that statement "do I have a right to a lawyer or not? Do I need a – I need an attorney?" was not an unequivocal request for a lawyer). See also *Lee*, 306 Ga. at 668 (holding that defendant's "numerous references to counsel," including, "It ain't gonna be too much different from when my lawyer get here," "I wanted to wait on my lawyer but I'll go ahead," and "Can I just wait until I get a lawyer?," were not unequivocal requests for counsel).

Likewise, Burns's second mention of counsel—"I'll just wait on a lawyer or something or whatever"—was not an unequivocal request to have a lawyer present, especially where Burns did not stop talking, saying, "Everybody already know," and proceeding to

tell, in a confusing manner, a story about a prior interaction with Winning. Instead, this comment was a reference to potentially obtaining counsel in the future and was not a clear and unambiguous request for an attorney. See *Taylor*, 312 Ga. at 10; *Lewis v. State*, 311 Ga. 650, 660 (2021) (concluding that the defendant's statement—"If I reach out to my attorney tomorrow"— was not an unequivocal invocation of the right to counsel); *Lee*, 306 Ga. at 668 (characterizing comment—"Can I just wait until I get a lawyer?"—as "future-oriented reference to counsel that was not clear invocation of right to counsel that required officers to immediately end an interview"). Thus, the investigators did not violate Burns's right to counsel by continuing to question him after this reference to a lawyer, either.

(d) The third mention of a lawyer—"Just get me a lawyer man. Please"—was, as the State concedes, an unambiguous request to have counsel present. The video shows that the investigators told Burns they could not question him, they stood up, and they started to leave the room. Burns, however, became visibly agitated and

23

kicked a trash can as the investigators moved toward the door, and clearly expressed a desire to talk with the officers about what happened with Winning, saying "you wanna tell somebody about it. You wanna tell what the f**k is going on and they won't listen." The investigators sat back down, listened while Burns talked, but did not ask Burns questions about Winning's death. Notably, Burns does not point to any improper question or comment about the crime or any coercive action by the investigators after Burns clearly invoked his right to counsel, and in our own review of the video, we have identified none. And although the investigators did not leave the room, they were not necessarily required to do so, and they did make an effort to leave the room before Burns became agitated. See *Pauldo* 309 Ga. at 134–35; *Brown*, 287 Ga. at 479–80. After Burns made an unambiguous request for counsel, he almost immediately expressed frustration that the investigators were getting up to leave and then clearly expressed a desire to talk with them. The investigators acknowledged Burns's request for counsel and told him they would listen and not ask questions. Burns then started

24

talking—about his anger at Winning and his beating Winning to death, as well as other topics—and kept talking and talking, never again referencing a desire for a lawyer.

Under the totality of these particular circumstances, we conclude that Burns's continued discussion about the circumstances of Winning's death amounted to a reinitiation with the investigators and an implicit knowing, voluntary, and intelligent waiver of his right to counsel. See *Berghuis v. Thompkins*, 560 US 370, 385 (2010) ("As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford."); *State v. Lopez-Cardona*, 319 Ga. 222, 227 (2024) (holding that "waiver [of *Miranda* rights] may be implied from all the circumstances" (quotation marks omitted)). Thus, the trial court did not err in concluding that Burns's statement was admissible. See *Pauldo*, 309 Ga. at 144 (concluding that the defendant reinitiated contact with officers and that his statements "evinced a willingness and a desire for a generalized

25

discussion about the investigation" (quotation marks omitted));

*Rigsby v. State*, 306 Ga. 38, 41 (2019) (concluding that the defendant spontaneously and voluntarily made incriminating statements after previously invoking his right to counsel, where the defendant reinitiated the discussion). See also *Tripp*, 320 Ga. at 552 (presuming that the defendant had invoked his right to counsel and holding that his spontaneous statements were admissible); *Taylor*, 303 Ga. at 231 ("When a suspect admits to her guilt without being prompted, that admission is not suppressed merely because she earlier invoked the right to counsel."); *Brown*, 287 Ga. at 479–80 (concluding that the defendant's statement, made after an invocation of the right to counsel, was admissible even though the detectives remained in the room, where the record of the interview "unequivocally shows that they did not engage in any coercive conduct by doing so"). See also *Edwards*, 451 US at 484–85. Accordingly, we conclude that Burns has failed to establish that the trial court erred in allowing his statement into evidence.

4. Finally, Burns argues that the trial court "erred in admitting

inflammatory evidence," consisting of "numerous autopsy photographs" that were "graphic and cumulative of [the medical examiner's] testimony." This claim is without merit.

Burns relies on *Brown v. State*, 250 Ga. 862 (1983), which was decided under the former Evidence Code and has been abrogated by the current Evidence Code. See *Venturino v. State*, 306 Ga. 391, 394–95 (2019). Under the current Evidence Code, "we generally evaluate the admissibility of autopsy photographs under OCGA §§ 24-4-401, 24-4-402, and 24-4-403."[8] *Mitchell v. State*, 307 Ga. 855, 863 (2020). And, in this appeal, because Burns did not object to the admission

---

[8] OCGA § 24-4-401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

OCGA § 24-4-402 provides: "All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible."

OCGA § 24-4-403 provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

of the autopsy photographs, we review his claim for plain error only. See *Benton v. State*, 301 Ga. 100, 103 n.4 (2017). To establish plain error, an appellant must show "that an error occurred, was not affirmatively waived, was clear and obvious beyond reasonable dispute, and affected his substantial rights." *Burke v. State*, 320 Ga. 706, 706 (2025). If the appellant makes these showings, we have "the discretion to remedy the error only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Whittaker v State*, 317 Ga. 127, 133 (2023) (quotation marks omitted).

Here, five photographs taken by the medical examiner were introduced into evidence during the medical examiner's testimony. Two of the exhibits were pre-incision photographs, with one showing Winning's bloodied face and t-shirt, and the other showing a side view of his head and the "fingerprint" bruising around his neck. The other three photographs were post-incision, with one showing the depressed skull fracture and the other two showing the fractured hyoid bone after it had been removed during the autopsy. The

medical examiner testified that the photographs showed Winning "as he was received" and the injuries he sustained. Because the photographs showed Winning's injuries and illustrated the medical examiner's testimony about the cause of death, they satisfy the standard for relevance and admissibility under the current Evidence Code. See OCGA §§ 24-4-401, 24-4-402. See also *Burks v. State*, 322 Ga. 865, 873–74 (2025) (explaining that autopsy photographs may be relevant to show a victim's injuries). And the photographs are not particularly gory or gruesome, and thus not unfairly prejudicial, such that they should have been excluded under OCGA § 24-4-403. See *Salvesen v. State*, 317 Ga. 314, 317 (2023) (holding that even where photographs of the deceased victim and autopsy photographs were gruesome, that did not render them inadmissible under Rule 403). Thus, Burns has failed to demonstrate any error, let alone plain error from the admission of these photographs into evidence. See *Burks*, 322 Ga. at 873–74 (holding that the trial court did not abuse its discretion in admitting two post-incision autopsy photographs that were relevant to show the nature and location of

29

the injuries and to illustrate the medical examiner's testimony about the cause of death); *Benton*, 301 Ga. at 104 (holding that the appellant failed to demonstrate error, much less plain error, in the trial court's admission of two post-incision autopsy photographs that were relevant to show the location of a bullet and one pre-incision autopsy photograph that depicted the victim's external injuries). Accordingly, this claim fails.

*Judgment affirmed. All the Justices concur.*